Hunt *v.* Hunt.

*(Nashville,* December Term, 1934.)

Opinion filed March 19, 1935.

CHARLES M. BRYAN and BLAN R. MAXWELL, both of Memphis, for appellant.

H. H. HONNOLL, of Memphis, for appellee.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This suit was brought to impress a trust in complainant's favor, to the extent of a joint interest, upon certain property in Memphis held by his wife, the defendant. The trust rests upon an alleged parol agreement of the parties, and the case was tried before a jury. The jury found in favor of complainant, and the chancellor approved the verdict and entered an appropriate decree. The Court of Appeals affirmed the decree of the chancellor, and defendant filed a petition for *certiorari*, which we have granted.

Charles G. Hunt and Dee O'Connor were married in 1908. Upon the trial of the case below in October, 1933, Mrs. Hunt testified that she was 60 years of age. The precise age of Hunt does not appear, although the record indicates that he is older than his wife.

The parties appear to have lived on affectionate terms until 1932 or 1933. About this time trouble arose between them and they separated. Mrs. Hunt required her husband to leave the house where they lived; the title of the same standing in her name. She also brought suit against him for divorce, and the divorce case seems to have been pending in another court at the time of the trial of this cause before the chancellor.

At the time of their marriage, Hunt testified that he had about $8,000. Mrs. Hunt testified that he had nothing. He said that she had about $3,000 and afterwards got $1,000 more from some building and loan stock. She

said that, including her building and loan stock, she had about $9,000 when they married.

It must be conceded that neither of these parties in testifying manifested a disposition to be entirely frank. Both of them appeared disposed to forget things that they conceived would be prejudicial to their interests in the litigation. Both seemed to love money. Hunt had been married previously, and his first wife obtained a divorce from him. Whatever money he had at the time of his marriage to his present wife was in the hands of his relatives probably, it is suggested, to keep his first wife from getting alimony. The present Mrs. Hunt, formerly Dee O'Connor, lived with her widowed mother before the latter's death, and was charged by her brothers and sisters with having appropriated something over $6,000 of the mother's funds. Indeed, the other distributees established this contention in court and obtained a judgment against Dee O'Connor for this amount about the time of her marriage.

After the marriage of the parties, whatever money she had was turned over by Mrs. Hunt to her husband. He was constantly employed, during the greater part of his married life with defendant, at an average salary of about $150 a month. Without controversy, both these parties have been extremely economical and thrifty. Hunt would turn over his salary each month to his wife and she would pay the household bills and allow him enough for personal expenses.

After Hunt's marriage to Miss O'Connor, he began to buy real estate. With the rents of property so bought and savings from his salary, other real estate was bought, and some of this real estate enhanced in

value. The parties had no children, and Hunt's salary was more than enough to support them. All the net rents and savings from his salary were reinvested. At the time this litigation started, the estate so accumulated is said to have been worth over $70,000.

Until 1920 the title to all the real estate was taken in Hunt's name. At that time he made two deeds conveying this real estate to Mrs. Hunt, under circumstances that will be hereafter mentioned. Title to the property acquired after 1920 was taken in Mrs. Hunt's name. Some bank accounts were kept in Hunt's name and some in his wife's name. The proof, however, overwhelmingly shows that Hunt managed the estate and made the investments, consulting at times with his wife, and she assisting in the collection of rents. The real estate men, insurance men, and others with whom dealings were had concerning the property practically all had their negotiations with Hunt and did not know his wife in the transactions.

In 1920, while Hunt conveyed all the real estate to Mrs. Hunt, he continued, however, to manage the property as before and likewise managed the property thereafter acquired, title to which was taken in his wife's name.

In the bill filed Hunt avers that there was, at the time of these transfers to his wife, a definite agreement between them that they were to jointly use and enjoy the property, and that the conveyances were made upon her express promise that she would hold title to the said property in trust and for their joint benefit. By way of preserving Hunt's interest, it was averred that Mrs. Hunt, at the time the deeds were made, executed a will leaving all the property to her husband upon her death.

In his testimony Hunt reiterates these statements contained in his bill a number of times, and his testimony to this effect is not shaken on cross-examination.

Explaining the reason for the conveyances to his wife, Hunt said that they were made upon her persistent request to that effect; that, having full confidence in her loyalty and integrity, and on account of his love and affection for her, he yielded to her insistence with the idea of preserving harmony in the family and in full reliance upon her promise to hold their property for their joint use and benefit.

Mrs. Hunt, in her answer and in her testimony, flatly denied that she made any such agreement as Hunt charges. She claimed that the property was hers; that it consisted of her original contribution and the increment thereof. She said that she allowed the title to the property to be taken at first, and to stand for a time, in her husband's name, owing to the fact that there was a judgment for about $6,000 against her in favor of the other distributees of her mother on account of the funds of her mother she was found in the chancery court to have appropriated. She also said that she was very much in love with Hunt, and for a time paid no attention to these titles, but that some instances came to her notice in which married men holding realty died intestate and their widows were remitted to homestead and dower. She obtained the conveyances because she wished to obviate any such result in her own case.

Mrs. Hunt at first denied that she had made any will in her husband's favor at the time of the execution of these deeds. Later, however, she said that she did not recall having made any such will. There is little doubt

that the will was executed at the time the deeds were made, because Judge KETCHUM testified in the case and confirmed Hunt's statement about the will. Judge KETCHUM drew the will and found in his files, at the time the proof was taken, a jacket, the indorsement on which indicated that a will had been made by Mrs. Hunt in favor of her husband as charged. The carbon copy of the will had been extracted from the jacket.

It does not appear that Hunt ever discussed with any one else prior to this litigation the alleged trust agreement with his wife respecting the property. He said that he regarded this as a family matter, not appropriate for discussion with others. A sister and a niece of his wife testified to hearing Hunt repeatedly refer to the property as his wife's prior to the estrangement. Other witnesses testified to having heard Mrs. Hunt refer to the property as ours prior to the estrangement. We attach little importance to any of this evidence. The testimony of Mrs. Hunt's sister and niece was of course interested, and, on the other hand, the reference by a married woman to her property as ours is not significant, even though the title be in her name. At last, then, the existence or nonexistence of this parol trust depends on the testimony of Hunt and of Mrs. Hunt and such relevant circumstances as the record discloses. A careful consideration of the proof from these witnesses and of the weight of these circumstances is necessitated; the first error assigned in this court being that there is no evidence or no sufficient evidence to sustain the verdict of the jury and the finding of the courts below.

It is conceded that the seventh section of the statute of frauds is not in force in Tennessee and that a trust in real estate may rest upon a parol agreement. *Woodfin* v. *Marks*, 104 Tenn., 512, 58 S. W., 227; *Thompson* v. *Thompson* (Tenn. Ch. App.), 54 S. W., 145.

An express trust, like a resulting trust, without written support, must be established by evidence that is clear and convincing. The chancellor correctly so charged in this case. There is some criticism of the chancellor's charge because he did not use other phraseology in instructing the jury as to the necessary *quantum* of proof, but we think this criticism is not well made. Other phraseology does appear in some of our cases, but the variation of language is not material. The different expressions employed have about the same meaning; and it is enough to say that the proof must be clear and convincing.

The usual rule in civil cases that the appellate court will not interfere if there is any evidence to sustain the verdict of a jury approved by the trial judge, does not apply in weighing evidence offered to set up a parol trust.

In *McDonald* v. *McDonald* (Overton equity, February 13, 1917), a case involving this question, it was said by Judge WILLIAMS, speaking for the court: "We think it apparent that the usual rule as to there being any evidence to support the verdict of the jury ought not to find application in a case involving the establishment of a resulting trust. Had the case been tried by the chancellor, the test that would be applied on appeal would be that of clear and cogent proof; and it ought not to be in the power of counsel for complainant and as a mat-

ter of procedure, to deflect the cause and determine its fate by changing this burden of proof in the appellate court by a mere demand for a jury in the court below.''

This rule has been later applied by this court in other cases and has been observed in the Court of Appeals. We think the rule is sound.

■ ■ The constitutional guaranty of trial by jury (article 1, sec. 6) refers to common-law actions and not to suits of an equitable nature. *Neely* v. *State*, 4 Baxt. (63 Tenn.), 174; *Jackson, Morris & Co.* v. *Nimmo*, 3 Lea (71 Tenn.), 597; *Miller* v. *Washington County*, 143 Tenn., 488, 226 S. W., 199. The ruling in *Tyrus* v. *Railroad Co.*, 114 Tenn., 579, 86 S. W., 1074, and similar cases, that there can be no constitutional exercise of the power to direct a verdict where there is a dispute as to any material evidence, does not apply to equity cases. *Mutual Life Ins. Co.* v. *Burton*, 167 Tenn., 606, 72 S. W. (2d), 778. Verdicts are not directed in chancery.

■ It is to be observed that section 10574 of the 1932 Code departs somewhat from section 4465 of the Code of 1858 providing for juries in chancery. Under the new Code a party is not entitled to a jury in chancery ''in cases involving complicated accounting, as to such accounting'' and in cases ''elsewhere excepted by law or by provisions of this Code.'' So it is not every case in chancery in which a jury can be demanded and, the constitutional provisions not applying to cases of an equitable nature, the chancellor has a much broader latitude in withdrawing issues from a jury than the circuit judge does in directing a verdict.

■ Section 4465 of the 1858 Code provides that ''all the issues of fact in any case shall be submitted to one

jury." Section 10574 of the 1932 Code provides that "all the issues of fact in any proper case shall be submitted to one jury." A case involving a parol trust is not a proper case in which to submit to a jury the issue of the creation of the trust unless there is clear and convincing evidence in favor of the proponent. The chancellor merely withdraws the issue and has no occasion to charge at all with respect to the fact. Const. art. 6, sec. 9, does not reach this situation.

There was but one issue of fact submitted to the jury, to-wit: "Was it agreed between complainant and defendant prior to May 25, 1920, that title to the properties here involved should be held by defendant for the joint benefit of complainant and defendant?"

In the light of what we have said, obviously the question to be determined here is whether there was clear and convincing evidence to justify the jury's affirmative response to the above issue. We think that there was.

As heretofore said, Hunt testified that there was a definite agreement at the time of the execution of the deeds that title to the properties involved should be held for the joint benefit of himself and wife. Ordinarily, the evidence of a single interested witness would not be sufficient to set up a trust resting in parol. In this case, however, Hunt's statements are confirmed by circumstances appearing in the record, and, it seems to us, by admissions of Mrs. Hunt in her own testimony.

In the first place, Hunt appears to be a more credible witness than his wife. The record does not show that Hunt has ever been charged with fraud. It has not been adjudged that Hunt ever appropriated any funds belonging to his family or to others. It is not shown that

Hunt ever covered up any of his property to defeat the collection of a judgment in favor of persons defrauded by him. The record in the suit of his first wife for divorce discloses that she sought no alimony nor was any alimony decreed in her favor.

With the exception of the testimony of Mrs. Hunt and the testimony of her sister and niece, there is little impeachment in this record of anything that Hunt said— no other impeachment of his material statements. His testimony as to his habits, his earnings, his management of the estate, and other relevant matters is corroborated by many witnesses herein, and is not contradicted save by the interested witnesses above mentioned.

On the contrary, excepting her sister and niece, other witnesses testifying contradict Mrs. Hunt's statements as to her husband's habits, earnings, and his management of the estate. Judge KETCHUM contradicts her testimony that she did not make a will in Hunt's favor at the time the deeds were executed, and some of her evidence is not altogether consistent with other portions thereof.

Upon cross-examination, while Mrs. Hunt denied that her husband reserved any interest in the property at the time the deeds were made in 1920, she said: "I told him (Hunt) that I would always be good to him and I was. I always tried to be good to him and to love him and as long as he lives he will never want for anything." Elsewhere in her evidence, though still denying any agreement for joint ownership, the following appears:

"Q. Were you thoroughly willing to let him, however, as your husband, to get the benefit of the property?

"A. Yes.

"Q. As long as you lived amicably together?

"A. Yes."

These statements of Mrs. Hunt plainly indicate that it was contemplated by both parties that Hunt was to have benefit of the property during the continuance of the marriage relation. Certainly no disturbance of the marriage relation was contemplated by either in 1920. The execution of the will in Hunt's favor by his wife, at the time the conveyances were made to her, rather plainly show that the parties intended that Hunt was to have the estate, if he survived his wife.

It is not material whether this estate had its foundation in property originally belonging to Mr. Hunt or to Mrs. Hunt, nor is it material to inquire how much either contributed to its foundation. All of Mrs. Hunt's property was personalty, all of it went into the hands of her husband prior to the passage of either of the married woman's emancipation acts, and such property became Hunt's by virtue of his marital right. In 1920 Hunt was a man at least in middle life. It is scarcely reasonable to think that Hunt would have turned all his property over to his wife, some of which had been acquired by his own industry, and all of which he had for years handled as his own, without some protection for himself. His own testimony, his wife's admissions, his continued management of the property, and the will made by her in 1920, confirm the idea that there was an agreement for a common estate, Hunt to take if he survived.

We reach the conclusion, accordingly, that there was evidence of a clear and convincing, or cogent and satisfactory, character to sustain the finding of the jury in favor of the trust.

It is assigned for error that all the testimony of Hunt relating to the agreement between himself and his wife was incompetent by reason of section 9777 of the Code, providing as follows:

"In all civil actions, no person shall be incompetent to testify because he is a party to, or interested in, the issue tried, or because of the disabilities of coverture, but all persons, including husband and wife, shall be competent witnesses, though neither husband nor wife shall testify as to any matter that occurred between them by virtue of or in consequence of the marital relation."

It has not been decided that a husband or wife is incompetent as a witness as to the matters proscribed when the litigation is directly between themselves. On the contrary, this question has been expressly reserved in *Patton* v. *Wilson,* 2 Lea (70 Tenn.), 101. It is not necessary to determine the question here.

Hunt and his wife each testified without exception from the other as to the alleged trust agreement. Her counsel objected to his testimony on the ground that it was in contradiction of the terms of a written instrument, but no objection was made on the ground that such testimony was inadmissible under section 9777 of the Code. No such point was made in the motion for a new trial. No such objection is therefore available now.

It is also urged that Hunt's testimony as to the alleged trust agreement was inadmissible as tending to contradict or vary the terms of the deeds made by him to his wife and the deeds under which she acquired property after 1920 in her own name. This matter is discussed in *Mee* v. *Mee,* 113 Tenn., 453, 82 S. W., 830, 106

Am. St. Rep., 865. It was there held that, where a deed conveys an absolute title, without more, parol evidence was admissible to show an unexpressed agreement made at the time the deed was executed that the property should be impressed with a trust. It was further held, however, that where a deed, by its terms, confers on the grantee a discretion to dispose of the land as she pleased, a discretion totally inconsistent with a mandatory trust, parol evidence was inadmissible to establish a mandatory trust, because such evidence would contradict the terms of the deed. The court used the following language:

"If the deed, upon its face and by its terms, is absolute, and conveys to the grantee a fee-simple estate, without more, the trust character can be shown by parol, because this would not in any way contradict the terms of the deed. But if the deed contains provisions which expressly or by clear imputation give the grantee a power or discretion to defeat the trust, or are inconsistent with it, then the trust does not exist in such shape as to be mandatory upon the grantee." *Mee* v. *Mee, supra.*

██ Two of the conveyances made to Mrs. Hunt after 1920 were to her sole and separate use, "free from the debts, contracts, and all marital rights of her present or any future husband." One can scarcely have a joint interest or other interest in property that is free from his contracts, save by way of spendthrift trust, and proof by Hunt tending to show such an interest in the property conveyed to his wife "free from his contracts" should have been ruled out.

Neither the deeds of Hunt to his wife nor the deeds of other parties made directly to her after 1920, except the two just mentioned, expressly exclude Hunt's interest. These instruments therefore fall under the first class noted in *Mee* v. *Mee.* Parol evidence was competent to impose a trust upon the lands so conveyed.

It is further said that the trust agreement, if made in 1920, would have no effect on the property thereafter acquired by Mrs. Hunt, since to have been effective such an agreement must have been contemporaneous with the making of the deeds. This rule, however, is not controlling here. All of the property acquired after 1920 was acquired with the proceeds and increment of the property conveyed to Mrs. Hunt in that year, augmented by savings from his salary. Mrs. Hunt had no outside income. The after-acquired property is therefore, exclusive of Hunt's contributions, nothing but the increase of a trust estate, which the *cestui* is entitled to follow; the last observation, of course, not applying to the property conveyed to Mrs. Hunt to her separate use, free from her husband's contracts, nor to the increment of that property.

Upon the verdict of the jury herein, the chancellor decreed that Hunt and wife were tenants in common in the estate, being of opinion that a tenancy of the entirety could not be created in the manner in which this joint estate arose. We understand, conceding the property to have been impressed with a trust, there is no objection to the chancellor's decree in the particular just noted.

The decree of the Court of Appeals is, with the modification indicated, affirmed, and the cause remanded to the chancery court for further proceedings.