Marvin E. ALEXANDER and Wendell Alexander, Plaintiffs-Appellees,

v.

C. C. POWELL REALTY COMPANY, INC., Defendant-Appellant.

Court of Appeals of Tennessee, Western Section.

Nov. 18, 1975.

Certiorari Denied by Supreme Court Jan. 26, 1976.

William B. Acree, Jr., and Elam, Glasgow, Tanner & Acree, Union City, for plaintiffs-appellees, Marvin E. Alexander and Wendell Alexander.

C. W. Miles, III, and Miles & Miles, Union City, for defendant-appellant, C. C. Powell Realty Co., Inc.

CARNEY, Presiding Judge.

The Plaintiffs below, Appellees herein, Marvin E. Alexander and Wendell Alexander, of Martin, Tennessee, a partnership d/b/a Alexander Real Estate and Auction Sales, recovered a judgment for $2,000 against the Defendant-Appellant C. C. Powell Realty Company of Union City, Tennessee, a Tennessee corporation. Cecil C. Powell is the controlling stockholder and chief executive officer of the corporation. Cecil C. Powell is engaged in the retail grocery business and buys and sells real estate.

The Plaintiffs below sued on the alleged breach of oral contract to sell a 75-acre tract of land in Weakley County, Tennessee, and pay Plaintiffs a broker's commission for finding a buyer ready, willing and able to buy on Defendant's terms.

The Defendant-Appellant pleaded the Statute of Frauds and no contract but only a discussion of sale. The Chancellor held that Plaintiffs were entitled to the commission and that the Statute of Frauds did not apply to a contract for a broker's commission.

The 75-acre tract was titled in the name of the corporation. However, the parties dealt with each other as if it were titled in the name of C. C. Powell individually and it was not until after suit was filed that Plaintiffs learned that Cecil C. Powell was not the title holder.

By assignment of error No. I the Appellant landowner, C. C. Powell Realty Company, insists that the Chancellor erred in failing to hold that T.C.A. Section 23–201, subsection 4, the Statute of Frauds, barred Plaintiffs' suit. For convenience, we quote said section as follows:

"23–201. *Writing required for action.* —No action shall be brought:

(1) Whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate;

(2) Whereby to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person;

(3) Whereby to charge any person upon any agreement made upon consideration of marriage, or,

(4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one year; or

(5) Upon any agreement or contract which is not to be performed within the space of one (1) year from the making thereof;

Unless the promise or agreement, upon which such action shall be brought, or

some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized."

Tennessee does not have a special statute of frauds applying to brokers' commissions on the sale of real estate such as many states have enacted. 103 A.L.R. 822; 17 A.L.R. 891; 56 A.L.R. 783.

In *Restatement of the Law of Agency,* Second Edition, American Law Institute, 1958, such statutes are discussed. We quote from Chapter 14, *Agent v. Principal,* Section 468, *Statutes of Frauds as Defense* as follows:

(2) If a statute provides that a person employing another for a specified purpose shall not be liable to the other for compensation although the other renders the promised performance, unless the employer has signed a memorandum in writing, a person has no duty to pay to another whom he orally employs for such purpose either the promised compensation or the reasonable value of services rendered. (3) Except as stated in Subsection (2), an agent who has partially or fully performed a contract which is not enforceable because a memorandum thereof has not been signed is entitled to the fair value of services rendered if the principal refused to perform the contract or to sign a memorandum.

.        .        .        .        .

Comment on Subsection (2):

b. Statutes similar to the one referred to in this Subsection are not infrequently enacted with reference to contracts with real estate brokers. The memorandum commonly required under such statutes is one which describes the thing to be sold and the terms of compensation. In the absence of such a memorandum, the employer, although benefited by the service of the agent who has been orally employed by him, is under no duty to give compensation in any form. As stated in Section 414(3), however, unless the principal is willing to make a memorandum, the agent is under no duty to perform.

The rule stated in this Subsection differs radically from that applying to the ordinary Statutes of Frauds. Its purpose is to protect against fraudulent claims for services; if the broker were entitled to obtain the value of services the statute would not have the effect intended. Brokers are professionals; it is not unfair to deprive them of compensation if they do not adopt the safeguards of which they should be aware.

The general rule, however, is that the contract of employment between a broker and his principal may be either written or oral, irrespective of the nature of the property relative to which negotiations are to be instituted. 12 Am.Jur.2d, *Brokers,* B. *Necessity of Written Contract,* Section 38, Generally, page 801; 151 A.L.R., page 648, Annotation, *Statute of Frauds, Broker's Contract* ; 9 A.L.R.2d, page 749, Annotation, *Writing Evidencing Broker's Contract,* and 12 A.L.R.2d, page 1410, Annotation, *Oral Contract to Purchase—Commission.*

The specific question whether a broker's contract for the sale of real estate must be in writing has not been raised in the appellate courts of Tennessee to the best of our research.

In the case of *Loventhal v. Noel,* 196 Tenn. 308, 265 S.W.2d 891 (1954), opinion by Justice Burnett, later Chief Justice, cited by Appellees, a real estate broker was allowed to recover his commission for finding a purchaser ready, willing and able to buy the real estate after the owner had first accepted and later rejected the offer submitted by the real estate broker. The owner subsequently sold the property to other persons at a slightly higher price. The listing of the property with the broker was admitted. The record does not reveal whether the listing was oral or written.

In *Slesinger v. Glatt,* 52 Tenn.App. 307, 373 S.W.2d 220 (1962), this Court awarded a judgment in favor of the Plaintiff broker, Slesinger, against the Defendant landowner, Mrs. Glatt, for services rendered in connection with the sale by Mrs. Glatt of a parcel of land which she had listed with the

Plaintiff. The property was under lease to DX Sunray Oil Company coupled with the right of refusal in DX Sunray to purchase the property. Slesinger, the broker, found a purchaser, McLemore, who signed a written contract to buy the property at a designated price with a proviso that his contract would be void if DX Sunray Oil Company exercised its prior right to purchase. After learning that Mrs. Glatt had a bona fide purchaser, DX Sunray Oil Company exercised its right to purchase on the terms of the McLemore contract. This Court sustained the validity of the oral agreement by Mrs. Glatt to pay Slesinger a commission in case the property was sold to DX Sunray. However, in the opinion, we stated that even in the absence of an express agreement this Court would have awarded a judgment to the Plaintiff for the value of his services under quantum meruit and to prevent unjust enrichment to Mrs. Glatt.

The Statute of Frauds apparently was not pleaded. The employment of Plaintiff as broker was uncontradicted. The only question of fact was whether Mrs. Glatt agreed to pay the broker a commission only on sale to McLemore or whether she agreed to pay a commission whether the lot was sold to McLemore or DX Sunray Oil.

We have been able to find no case in Tennessee where the agency was disputed and the land not sold. However, in the Slesinger case discussed above this Court refused to allow Plaintiff Slesinger a commission on a lot described as Lot No. 1 for which Slesinger found a buyer, McLemore, and which was not sold either to McLemore or to DX Sunray Oil. The agency of Slesinger was not disputed. We denied recovery of a commission because the contract with McLemore expressly provided for no sale of Lot No. 1 if DX Sunray exercised its option to purchase Lot No. 2.

█ The relationship between a principal and his broker is one of mutual trust. Our courts require a principal to act in good faith toward his broker. *Barnett v. Thirkield,* 201 Tenn. 528, 300 S.W.2d 905 (1957); *Peavy v. Walker,* 39 Tenn.App. 382, 284

S.W.2d 1 (1954); *Thomas v. Million,* 35 Tenn.App. 604, 250 S.W.2d 111 (1952).

█ A real estate broker is a fiduciary. *Ottarson v. Dobson & Johnson, Inc.,* 52 Tenn.App. 280, 372 S.W.2d 777 (1963).

█ A principal is liable to a purchaser for the fraud or misrepresentation of his broker. *Hunt v. Walker,* 483 S.W.2d 732 (Tenn.App.1971).

█ An agent or broker may even make a binding contract to sell his principal's real estate under a parol contract of agency. *Cobble v. Langford,* 190 Tenn. 385, 230 S.W.2d 194 (1950); *Lowe v. Wright,* 40 Tenn.App. 525, 292 S.W.2d 413 (1956).

█ In Tennessee, unlike many other states a trust in real estate may be established on parol evidence. *Hunt v. Hunt,* 169 Tenn. 1, 80 S.W.2d 666 (1934); *Woodfin v. Marks,* 104 Tenn. 512, 58 S.W. 227 (1900).

█ However, in such cases the quantum of proof necessary to establish such trust is more than a bare preponderance and must be clear, cogent and convincing though not necessarily uncontradicted. *Greenwood v. Maxey,* 190 Tenn. 599, 231 S.W.2d 315 (1950).

Chief Justice Green, in *Hunt v. Hunt,* made the statement: "Ordinarily, the evidence of a single interested witness would not be sufficient to set up a trust resting in parol."

In *Kelley v. Whitehurst,* 37 Tenn.App. 360, 264 S.W.2d 1 (1953), this Court upheld the Chancellor's decree establishing a parol agreement to reconvey real estate of the decedent to the plaintiffs. In that case the testimony of the plaintiffs was corroborated by neighbors and relatives of the parties as well as the conduct of the parties.

█ While a broker's contract to sell or find a buyer for real estate does not technically create a trust estate or interest in the real estate of the principal, such contract may and often does give the broker the legal right to bind the principal's interest in such real estate in many ways. We hold that in Tennessee a broker's contract for sale of real estate may be oral but, by

analogy, the same quantum of proof necessary to establish a trust in real estate by parol evidence is necessary to prove an oral contract between a principal and a broker for the sale of real estate and that the contract must be proven by clear, cogent and convincing evidence though the evidence need not be uncontradicted. From this holding it necessarily follows that Appellant's assignment of error No. I that the Tennessee Statute of Frauds, T.C.A. Section 23–201, applies to the instant case is respectfully overruled.

■ We turn now to the Defendant's assignment of error No. II that there was no meeting of the minds and, therefore, no contract by Defendant with Plaintiffs. This assignment of error raises the question of the sufficiency of the evidence before the Chancellor to support the judgment in favor of the Plaintiffs.

There were no witnesses to the oral conversations between the Plaintiff Wendell Alexander or his brother, Plaintiff Marvin Alexander, and Cecil Powell, owner of C. C. Powell Realty Company.

Plaintiff Wendell Alexander testified that on or about October 4, 1972, he was settling up with Cecil Powell for the sale of Cecil's former home in Weakley County and asked him if he would sell the 75-acre tract of land involved in this litigation located on Highway 22 in Weakley County. Cecil Powell had just recently bought this property at a price of $37,500. Cecil replied that he would take $45,000 or $600.00 per acre. Wendell Alexander made no offer to purchase but told his brother, the Plaintiff Marvin Alexander, of the conversation.

The Plaintiff Marvin Alexander testified that he called Cecil Powell by phone or auto radio on October 11, 1972, and asked if he would take $40,000 for the 75 acres and pay a $2,000 commission. Powell had never mentioned selling the property to anyone except Wendell Alexander and had never sought the assistance of either of the Alexanders in selling the property. Cecil Powell rejected the offer made by Plaintiff Marvin Alexander saying that on the basis of the purchase price of $37,500 he would have no

profit but repeated his offer to take $45,000. Marvin did not say whether this was net or included a commission. At any rate, Marvin Alexander testified that after some conversation Cecil Powell agreed to take $42,000 and pay a $2,000 commission provided he could wait until six months' ownership had expired before giving a deed in order to obtain capital gain status on the profit for income tax purposes.

Plaintiff Marvin Alexander testified that he immediately called Robert Brundige, the person who had made him the original offer of $40,000, and Brundige agreed to the price of $42,000 but had some questions about the terms of sale and wanted more information. Before Marvin Alexander could get in touch with Cecil Powell, Cecil Powell's secretary called the next day, October 12, 1972, and informed Marvin Alexander that Cecil would not sell the property under any circumstances. Marvin testified that the next day, October 13, 1972, he saw Cecil Powell at a Rotary meeting in Martin, Tennessee, and when Cecil again refused to sell, Marvin told him he intended to sue him; that on the following day Cecil called him by telephone and said he would give Marvin until Monday, October 16, 1972, at twelve noon to sell the farm but he wanted all cash and would keep next year's crops.

Plaintiff Marvin Alexander testified that he confirmed the new terms with Brundige on Sunday, October 15, and located Cecil Powell on Monday morning, October 16, by telephone and offered to pay for the property all in cash or put up a deposit for Brundige at $42,000 because Brundige could not be present until the following Thursday to close the deal; that Cecil Powell said that there was no hurry, that he would close the deal on Thursday and that when Thursday came, Brundige offered to purchase and Cecil Powell refused to sell the property. The Plaintiffs filed the present lawsuit in October, 1973.

Plaintiff Marvin Alexander had prepared a written listing of the property but the record is not clear as to whether Cecil Powell refused to sign the written listing or whether Marvin Alexander failed to present

it to him in person. Wendell Alexander testified that Cecil Powell had listed two houses and lots with him for sale in October, 1972, but expressly refused to sign a written listing and after Cecil refused to complete the sale to Brundige of the 75 acres, he and his brother Marvin took no further action to try to sell the two houses and lots under the oral listing.

Cecil Powell testified that he had lived in Martin, Tennessee, twelve years prior to moving to Union City; that he was primarily in the retail grocery business but farmed and bought and sold real estate; that on or about October 5, 1972, Wendell Alexander, whom he had known for many years, was asking him about some of his farmlands and mentioned the Maness farm, that is, the 75 acres in question, and asked Cecil what he would take for it and Cecil said $100.00 an acre profit or a total of $45,000, to which Wendell said he might be interested; that the following Monday Marvin Alexander called and offered $40,000 which Cecil refused saying he would not take less than $45,000; that later he had his secretary call Marvin and tell him that he was not selling the farm at any price; that later he was at the Rotary Club in Martin, which was on a Thursday, and he again refused to sell the farm; that the following Thursday Marvin Alexander presented him a deed which he asked him to sign and he, Cecil Powell, refused to do so telling Marvin that he had never contracted with him to sell the farm and that he had never made any agreement except that he would take $45,000; that initially he had a written agreement with Wendell and Marvin Alexander for the sale of his homeplace in Weakley County which expired but later on they did sell the property and he paid the commission.

At the time of the trial in November 1974, Cecil Powell had sold 19 acres of the 75 acres for $1,000 per acre or $500 per acre profit through another broker who had no written contract and Cecil had paid the commission on the sale of this tract. There is no suggestion in the record that Cecil Powell was dickering with anyone else for the purchase of any part of the 75 acres at the time he refused to deliver the deed to Brundige on Thursday, October 19, 1972 or that he was negotiating with any other broker for the sale of the property.

The three parties and Brundige were the only witnesses. There was no corroboration of Plaintiff Marvin Alexander's testimony either by circumstantial or direct evidence regarding the terms and provisions of his alleged contract with Cecil Powell. The testimony of Brundige is only corroboration of Marvin Alexander's testimony that he found a buyer for the property. It is no corroboration of Marvin's testimony concerning the terms and conditions of his alleged contract with Cecil Powell.

At the conclusion of the trial His Honor the Chancellor expressed himself thusly concerning the preponderance of the evidence:

". . . The Court may very well be wrong about it, but it is the Judgment of the Court that the Alexanders have carried their slight burden of proof. They do not have proof beyond a reasonable doubt as you do in a criminal case, and he believes that they have, through the testimony of Mr. Marvin Alexander and Mr. Robert Brundige proven that there was a contract to sell the property for $42,000.00 so therefore, it results that there will be a judgment against Mr. Powell for $2,000.00. You may note your exceptions."

The uncorroborated testimony of Plaintiff Marvin Alexander disputed by Cecil Powell falls far short of being clear, cogent and convincing proof of an oral contract with Cecil Powell and is insufficient upon which to predicate a judgment against the owner of the land, C. C. Powell Realty Company. To establish such a precedent would be against public policy and make it hazardous for a landowner to have a private conversation with a broker in person or by telephone. Unscrupulous brokers could more easily perpetrate frauds not only upon their principals but even upon strangers. By this holding, we do not mean to cast any aspersions upon the Plaintiffs nor to infer that they are unscrupulous.

We hold simply that the uncorroborated testimony of the Plaintiff Marvin Alexander is insufficient as a matter of law to establish an oral broker's contract to find a purchaser for the 75 acres of land.

Assignment of error No. II is, therefore, sustained, the decree of the lower Court is reversed, and Plaintiffs' complaint is dismissed. The Plaintiffs are taxed with the costs in the Court below and in this Court.

MATHERNE, J., and McPHERSON, Special Justice, concur.