Blanche A. TANSIL and Rebecca
Tansil, Appellees,

v.

W. Grigsby TANSIL, Appellant.

Supreme Court of Tennessee,
at Jackson.

June 11, 1984.

George C. Thomas, Thomas, Welles &
Thomas, Dresden, for appellees.

W. Grigsby Tansil, pro se.

OPINION

FONES, Justice.

We granted appellant W. Grigsby Tan-
sil's rule eleven application to review the
finding of the Court of Appeals that there
was "clear, cogent and convincing" evi-
dence to establish the existence of an oral
trust in real estate.

Appellees, Blanche and Rebecca Tansil
were the former title holders to the realty
in question, 152 acres of land located in
Weakley County known as the "Tansil
homeplace." Blanche owned a three-
fourths interest and Rebecca a one-fourth
interest and the record reveals that the
homeplace consisted of about one hundred
acres of farm land and fifty acres of
woods. Appellant W. Grigsby Tansil is the
nephew of appellees.

On May 29, 1971, Grigsby Tansil mar-
ried. Blanche Tansil attended his wedding.
Sometime prior to the wedding, Grigsby
had written his aunts expressing an inter-
est in purchasing the homeplace.

At the wedding Blanche discussed the
disposition of the Tansil homeplace with
Grigsby and his two brothers, David and
John. Blanche and Rebecca considered
them the "only three heirs of the Tansil
family." Both David and John lived out-
side of Tennessee, had begun careers in
photography and nuclear physics respec-
tively, and further had not manifested any
desire to live on the homeplace or to farm
it. In contrast, Grigsby had already ex-
pressed his interest in the land and he was
farming other land that he owned nearby.

On January 21, 1972, appellees executed
a warranty deed, absolute on its face, con-
veying the Tansil homeplace to Grigsby, in
fee simple. On February 1, 1980, appellees
filed a complaint in the chancery court re-
questing that the Tansil homeplace be di-
vested from Grigsby and vested in appel-
lees. Appellees asserted, in their com-
plaint, that when the homeplace was trans-
ferred to Grigsby he took this property
upon an express declaration of oral trust,
to-wit:

The plaintiffs [appellees] advised the de-
fendant [Grigsby] that if he would as-
sure them that he would properly main-
tain the property and keep it in cultiva-
tion and would not sell the property but
would keep the property in the Tansil
family, they would transfer the property

to him based on these considerations and that the transfer would be free of any consideration, ...

In our opinion, the proof in support of the alleged oral trust is not clear, cogent and convincing.

We reaffirmed the long-standing rule that governs this case in *Sanderson v. Milligan*, 585 S.W.2d 573 (Tenn.1979), as follows:

[t]his court has consistently recognized that a trust may rest upon a parol agreement where the declaration of trust was made prior to or contemporaneous with a transfer, either by deed or by will, of an interest in realty. *See Brantley v. Brantley*, 198 Tenn. 670, 281 S.W.2d 668 (1955); *Hunt v. Hunt*, 169 Tenn. 1, 80 S.W.2d 666 (1935); *Mee v. Mee*, 113 Tenn. 453, 82 S.W. 830 (1904); *Linder v. Little*, 490 S.W.2d 717 (Tenn.App.1972); *Kelley v. Whitehurst*, 37 Tenn.App. 360, 264 S.W.2d 1 (1953). As a safeguard against fraud, the trust, and its terms must be proven by evidence that is clear, cogent, and convincing. *Hunt v. Hunt, supra; Linder v. Little, supra. Id.* at 574.

Contrary to some expressions in Tennessee cases indicating that the Tennessee rule is "unlike many other states" [1] in allowing the establishment of an oral trust in real estate, every jurisdiction in America embraces that rule. *See* Annot., 23 A.L.R. 1500 (1923). There is a great variety of expression among the states as to the degree of parole proof required to establish such a trust, but the courts are so uniformly reluctant to engraft an oral trust upon the legal title to real estate, evidenced by a written instrument absolute on its face, that all require a high degree of proof. The variations in expression appear to be rather insignificant. The words "clear" and "convincing" with varying combinations of third and fourth words are the most frequently used.

The establishment of the oral trust in this case rests entirely upon the testimony of Blanche Tansil, age eighty-three. She lived in Baltimore, Maryland, of necessity, because her eyes required regular treatment that she said was only available to John Hopkins Hospital. Appellant lived in Sharon, Tennessee. It is clear in this record that if there was an oral declaration of trust engrafted upon the deed to Grigsby it could only have taken place in May 1971 when Blanche came to Tennessee for Grigsby's wedding. There was no evidence offered of any telephone conversation or correspondence between May 1971 and the delivery of the deed in January 1972, wherein the Tansil sisters offered to convey the homeplace to Grigsby subject to the condition that he farm the land and that it remain forever in the Tansil family.

Blanche Tansil's testimony established that while in Tennessee for the wedding she wanted to learn the extent of the interest each of her nephews, David, John and Grigsby had in farming and in retaining ownership of the Tansil homeplace in the family; that she ascertained that David and John's circumstances were such that regardless of their interest it was not practical for them to further either of those objectives. But Grigsby was clearly in a position to carry out both objectives. She quoted him as saying:

"Aunt Blanche," he said, "I am a farmer. That is my love." He says, "I'd like to have charge of the farm."

She added later that,

"So, he—and he agreed that he would keep it in his possession, carry it on. He would farm it—that's the main word, he would farm it."

It is upon that testimony that the oral trust must be either sustained or rejected.

Grigsby's version of the discussion with his aunt, in May 1971, was that she informed him that they would not sell him the property but would rent it to him on the same terms that they had rented it to his father for many years, to-wit, for payment of the taxes; that upon their death they would leave the property to him in

---

1. *Alexander v. Powell*, 535 S.W.2d 154 at 157 (Tenn.App.1976) citing *Hunt v. Hunt, supra*, and *Woodfin v. Marks*, 104 Tenn. 512, 58 S.W. 227 (1900).

their wills, all of which was satisfactory to him.

Blanche returned to Baltimore and on January 10, 1972, wrote the following letter to her attorney in Dresden:

Dear Mr. Thomas:

This concerns the attached warranty deed made out to Grigsby Tansil, our nephew, for the transfer of the land known as the homeplace. Rebecca and I are the fourth generation of Tansils to hold this land. There was no purchase price involved in previous transfers, and we would like to pass it on to Grigsby in the same way. Can't you make out this deed of transfer without the consideration of a sum? We will appreciate your assistance to Grigsby in getting this land transferred to him. His two brothers, David and John, do not want the land and have instructed us to pass it on to Grigsby.

Sincerely,
Blanche Tansil

Blanche sent a copy of that letter to Grigsby with a handwritten note thereon that read as follows:

Dear Grigsby:

Here is a carbon copy of the letter I wrote to George Thomas, attached to the warranty deed. Can't you take this letter and deed to him and ask him to cross out the sum mentioned? We do not want you to pay for this, we want to give it to you. Then send the new deed to us and we will sign it.

Blanche

As a result of those letters a warranty deed conveying fee simple absolute title to the homeplace was executed by Blanche and Rebecca Tansil on January 21, 1972, and duly delivered to Grigsby. The consideration recited therein was "one dollar cash in hand paid, the receipt of which is hereby acknowledged, and the love and affection we hold for our nephew."

In analyzing the evidence to determine whether it met the clear, cogent and convincing test, the Court of Appeals found that several letters written by appellees to Grigsby in March, April and June of 1979, in which "numerous references and allusions" to the alleged agreement were made provided the necessary support to Blanche Tansil's testimony. The significance of those letters was said to be that they "confirmed by circumstances appearing in the record," that an oral trust was declared prior to the delivery of the deed. This was said to parallel the proof in *Hunt v. Hunt, supra,* where the Court said that ordinarily the testimony of a single interested witness would not be sufficient to establish an oral trust, but found that testimony "confirmed by circumstances appearing in the record, adequate to do so." *Id.* 169 Tenn. at 11, 80 S.W.2d 666.

We think there is a vast difference in the supporting circumstances in *Hunt* from those in the instant case. Mr. Hunt was successful in establishing that he had conveyed title to previously acquired real estate to his wife in 1920 and had had title to subsequently acquired properties taken in her name alone, all upon the express understanding that she would hold title in trust for their joint benefit, and leave the property to her husband in her will. At trial, Mrs. Hunt denied the existence of the trust but the court found the oral trust was confirmed "by admission of Mrs. Hunt in her own testimony." *Id.* at 11, 80 S.W.2d 666. Other confirming circumstances relied on by the court in *Hunt* were the testimony of many witnesses as to Mr. Hunt's management of the properties, his habits and earnings all of which pointed unerringly to the fact that he was the moving force in the property acquisitions. Also there was proof that Mrs. Hunt had actually made a will in favor of her husband, following her denial that she had done so, virtually destroying any credibility her testimony had.

On the other hand, we are unable to agree that the letters written by the Tansil sisters provide sufficient support or confirmation of Blanche Tansil's testimony, to establish by clear, cogent and convincing evidence that an oral trust was declared

prior to or contemporaneous with the execution and delivery of the deed.

When Blanche wrote to her lawyer on January 10, 1972 returning a warranty deed that had recited some monetary consideration and the entire subject of the matter was that there would be no consideration whatsoever flowing from Grigsby to the Tansil sisters, it seems logical to us that some mention would have been made of the oral trust, if one had in fact been declared. It seems even more reasonable to expect that in the note written to Grigsby at that time, a reminder of the conditions he was allegedly required to meet or forfeit the property would have been expressed. The time interval from May 1971 to January 10, 1972, seems to us to accentuate the probabilities that the oral trust would have been expressed in those letters had it existed.

The series of letters referred to by the Court of Appeals began with one dated November 7, 1973, from which that Court quoted as follows:

> Blanche and I gave you the homeplace because we believed you had a deep feeling for the land and would be proud that the land had always remained in the Tansil name.

In our opinion that letter expressed fully and completely all that motivated the transfer of the property to Grigsby, expectations that he would be a good farmer and keep the land in the Tansil family. But, as in the letter, there was no declaration that the deed had been given upon the condition that the land be farmed and remain in the Tansil family and upon failure to do so would revert to the grantors.

The first letter expressing a "contract" was written on March 29, 1979, more than seven years after the execution and delivery of the deed. The relevant part of that letter follows:

> But this is a serious letter to say that unless we get a report from you with records showing that seventy-five percent of the homeplace is in cultivation—either through renting land out or your cultivating it we are going to ask that you return the land to us. You have not fulfilled the contract made—that you would cultivate the land and would eventually build a place and live on the land.

The seventy-five percent cultivation requirement had never been mentioned before insofar as the evidence in the case reveals. Nor had the expectation that he would eventually build a place and live on the land.

The only other letter referring to a "contract" was dated June 27, 1979, the relevant part of which read as follows:

> I am going to review the handling of the homeplace and show you how you have failed to meet your contract or obligations which means you no longer have the right to have the land continue in your name—we had thought, of course, that you would [sic] and live on the land but this was not spelled out like the other commitments—cultivating and keeping land in family forever.

It is our opinion that the expectations of the Tansil sisters with respect to what Grigsby would do with the homeplace broadened, as the years went by, into commitments and then into the condition that if not performed the land would revert to them. There is not one scintilla of evidence that that condition of the trust was ever expressed prior to the letter of March 29, 1979.

The judgment of the Court of Appeals is reversed and the suit is dismissed. Costs are adjudged against appellees.

COOPER, BROCK and HARBISON, JJ., and TATUM, Special Justice, concur.