MARION PEAVY, Complainant, Appellee, v. T. B. WALKER, Defendant, Appellant.—284 S. W. (2d) 1.

Eastern Section.   August 13, 1954.

Petition for Certiorari denied by Supreme Court, December 16, 1954.

Moon & Anderson, of Chattanooga, for appellant.

Vanderveer & Parks and Wilkerson & Wilkerson, all of Chattanooga, for appellee.

McAMIS, P. J. This is an appeal by T. B. Walker, defendant below, from a decree awarding complainant a recovery for real estate commissions claimed in the bill.

The bill alleges that on December 29, 1951, defendant entered into a contract with complainant, a duly licensed real estate broker, giving complainant the exclusive right to sell defendant's property on North Chamberlain Avenue in Chattanooga within a period of 30 days for $125,000. In event of sale defendant agreed to pay complainant

a commission of 5%. The bill alleges that complainant immediately began contacting prospective purchasers including Fred A. Bryan who became interested in the property and that during the period of the listing defendant authorized complainant to negotiate a lease of the property to Bryan; that, although negotiations for a lease to Bryan were carried on during the period of the contract, no contract was actually signed during that period but that soon after the contract expired defendant entered into a lease contract with Bryan or the Chattanooga Transfer and Storage Company of which Bryan was president at a rental of $14,400 per year for a period of ten years with an option to the lessee to purchase the property at any time within the first three years of the lease; that complainant was solely responsible for bringing the property to the attention of Bryan and that it was as a result of his efforts that the lease was executed but that the defendant had refused to pay any commission for the sale.

The answer admits that defendant owned the property on December 29, 1951, and that he desired to sell it; that he gave complainant a 30 days option for the sale of the property but it was denied that he ever authorized complainant to negotiate a lease to Bryan or any other prospective purchaser. It was further admitted that some time after the expiration of the contract defendant negotiated a lease of the premises with the Chattanooga Transfer and Storage Company for a period of ten years from May 1, 1952, which lease was amended in September, 1952, to give the lessee an option to extend the lease for an additional ten years from May 1, 1962, and that the lease gave the purchaser an option to buy the property at any time within the first three years of the lease for $125,000 of which $25,000 was to be cash and the balance

payable at the rate of $1,000 per month with interest at 4% per annum.

The answer specifically denied that complainant negotiated a lease with Fred A. Bryan of the Chattanooga Transfer and Storage Company or that he had any authority to negotiate a lease and asserted that the lease which was finally negotiated was not the result of any effort on the part of complainant. Indebtedness to complainant for real estate broker's commission was denied.

After a hearing on oral testimony, the Chancellor found the facts as follows:

"In the course of complainant's activities to interest prospective purchasers, he brought together the defendant and Mr. Fred Bryan, president of the Chattanooga Transfer and Storage Company. The defendant and Mr. Bryan had not known each other previously and Mr. Bryan knew nothing of the property until it was shown him by the complainant and negotiations instituted between the parties. From the beginning of the negotiations brought about by complainant as an intermediary, Mr. Bryan was definitely interested in the property and was considering either purchase or lease. The defendant in the early stages of the negotiations was not interested in leasing the property but instead, wanted to sell. I am convinced from the testimony that Mr. Bryan, on behalf of his Company, was ready, willing and able to purchase the property and that he would have done so but for the fact that he was advised by his tax consultant and attorney that a lease might be more advantageous to the Company than the purchase.

"The negotiations between the defendant and Mr. Bryan continued until the expiration of the period during which the complainant exclusively held the property for sale and continued thereafter until a lease contract with

option to buy was consummated between them without intervention of complainant. The complainant was in on the negotiations, however, for the lease as well as for the proposed sale and tried to bring about an agreement to lease with option to buy before his exclusive contract expired.

"From the testimony, I am convinced that the Chattanooga Transfer and Storage Company, though willing to purchase if necessary to hold the property, is definitely of the opinion that the lease is more advantageous to it than a purchase and will probably never exercise its option to buy. Though the defendant did not so state, it seems highly probable to me, with the high rental provided, that he is better off with the lease than had he sold the property. If, and it seems to me to be definitely true, both the defendant and the lessee, whom the complainant brought together in negotiations, are better off with the lease than with a sale, it would be extremely inequitable to deprive complainant of his commission since he was the procuring cause for the favorable position in which the defendant Walker and the lessee find themselves."

We think it is clearly apparent from the proof, as the Chancellor held, that Mr. Bryan on behalf of his Company was, from the beginning, definitely interested in acquiring the property. He first considered purchasing it but, after consulting his attorney, determined that from a tax standpoint it would be more advantageous to enter into a lease contract. Defendant at that time, however, seems to have been adamant in his refusal to lease rather than sell. Mr. Bryan testified that the lease was considered even from the first day when he was taken to the property by complainant and we have no doubt that defendant knew, during the term of the contract, that negotiations

were proceeding between complainant and Mr. Bryan relative to a lease contract.

We concur in the Chancellor's finding that negotiations continued between defendant and Mr. Bryan until the expiration of the contract period and it appears without dispute that four or five days after the listing contract had expired defendant entered into the lease contract above mentioned. He says in his testimony that he knew complainant was attempting to negotiate a lease but that he refused because he did not want to lease the property and had in mind that he would sell it to a Mr. Cobble who had previously been interested in the property but had finally refused to buy; that after the contract expired he contacted Mr. Cobble but was unable to make a sale and that about that time Mr. Bryan came to the property and was doing some measuring and a day or two later Bryan came back to do some more measuring and suggested to defendant that he lease the building to him. Defendant then testified: "The fact of the business is we got together right there within a very short time." On February 8, 1952, the contract of lease was formally executed.

We think it is significant that defendant became interested in leasing the property only four or five days after the contract with complainant expired although, in conversation with complainant, he had steadfastly asserted his unwillingness to lease the property under any conditions. Whether he was holding off hoping to sell to Cobble we do not know but, whatever the reason, we agree with the Chancellor that it would be most inequitable to allow him to take the benefit of complainant's efforts without compensation. Bryan's interest in the property continued from the day it was first shown to him by the complainant until the lease contract was executed. He testified that he would have attempted to buy the property

except that from a tax standpoint it appeared more advantageous to lease it.

Defendant admits that, in contrast to his refusal even to consider a lease during the period of the listing, he was thereafter able to come to an agreement within four or five days and following a discussion with the lessee of only about two hours duration. It taxes credulity to believe that, in a transaction of such magnitude, defendant would completely reverse his thinking and come to a final decision in such a short time. After the lease contract was executed it was withheld from registration for many months and the lessee seems to have been somewhat evasive in replying to inquiries from complainant as to whether he had bought the property. Defendant, it seems from the circumstances, waited only long enough to see if he could sell to Cobble and to permit the listing to run out before executing a lease which we have no doubt was due to the efforts of complainant.

We do not appear to have a case in Tennessee directly in point. In Chambers v. Percefull, 28 Tenn. App. 517, 191 S. W. (2d) 568, the principal, after the broker had found a buyer, sold the property through another broker to the same purchaser, and in Thomas v. Million, 35 Tenn. App. 604, 250 S. W. (2d) 111, the broker's authority was revoked so that a sale could be made to his prospect. In both of these cases is was held that the principal was guilty of bad faith or fraud and could not escape liability for commissions.

Newman v. Hill, 29 Tenn. App. 388, 196 S. W. (2d) 1008, involved the question of which of two rival brokers should have been recognized by the principal as entitled to commissions. The opinion cites the broad general rule, taken from the annotation at 26 A. L. R. 784, that the broker must perform whatever obligations the contract

imposes upon him within the time as limited by the contract.

In Pyles v. Cole, 34 Tenn. App. 601, 241 S. W. (2d) 841, the contract was closed after the end of the listing period by the principal to a purchaser procured by the broker but in that case, the principal knew that the broker was continuing his efforts after the contract period and acquiesced therein.

In the absence of a controlling contract provision, acquiescence, bad faith or fraud, the courts of other jurisdictions appear to be in some disagreement as to whether the broker will be held strictly to the time limit of the contract. See text and notes 8 Am. Jur. 1086, 1087. Some courts hold that even where the broker is the procuring cause a sale made after the lapse of the contract creates no liability on the owner for commissions, while others hold the broker entitled to recover if the sale is nearing completion and there is no interruption in the negotiations. Ib. As to the factors usually considered by the courts we quote from the text: "The nearness to completion of the sale at the expiration of the time limited, the facts as to its being completed as a direct result of the broker's efforts, and the fact as to whether or not there has been an interruption in the negotiations, are elements to be weighed * * *."

In our opinion to permit defendant to exploit the services of complainant would amount to constructive fraud and, in view of the fact that complainant was the procuring cause and the negotiations continued practically without interruption and resulted in an agreement only four or five days after the expiration of the contract, we think recovery should be allowed.

We cannot agree that because a lease rather than a sale resulted from complainant's efforts there can be no recovery. Gilbert v. Smith, 14 Tenn. App. 500, 506;

Thomas v. Million, supra, 35 Tenn. App. 604, 607, 250 S. W. (2d) 111.

■ ''Where a broker is the procuring cause of a contract concluded by the principal with a customer produced by the broker, and any special conditions attached to the right to a commission have been fulfilled or waived, the fact that the contract so concluded differs in price or terms from the one which he was authorized to negotiate does not deprive him of his right to a commission.'' 12 C. J. S., Brokers, Sec. 86 (b), p. 196. See also 8 Am. Jur. 1101.

Since a contract has been consummated the question of whether complainant produced a purchaser who was ready, willing and able to contract on terms which defendant found acceptable deals with mere abstractions. Hutchinson v. Dobson-Bainbridge Realty Co., 31 Tenn. App. 490, 217 S. W. (2d) 6.

■ We think there is no merit in defendant's assignment that the Chancellor erred in awarding a conditional decree for 5% sales commissions in event defendant exercises his option to purchase at the end of three years from the date of the lease. Barton v. Rose, 137 Tenn. 503, 194 S. W. 575, L. R. A. 1917E, 928, holds that a broker who has merely produced an optionee has not produced a purchaser able, willing and ready to buy but in that case the optionee had before suit ''exercised the privilege of not taking over the property''. The rule is that the right to compensation will accrue when and if the option is exercised. 8 Am. Jur. 1093, 1094, Brokers, Section 177. No question is made as to how the amount of the sales commission will be computed or to the form of the decree.

We find no error and it results that the decree is in all respects affirmed with costs.

Hale and Howard, JJ., concur.