*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GRUBB & ELLIS/CENTENNIAL, INC.,

*Plaintiff-Appellant,*

v.

No. 04-5198

GAEDEKE HOLDINGS, LTD. and GAEDEKE LANDERS, L.L.C.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-00016—Todd J. Campbell, District Judge.

Argued: February 4, 2005

Decided and Filed: March 30, 2005

Before: GIBBONS and SUTTON, Circuit Judges; EDGAR, Chief District Judge.[*]

---

## COUNSEL

**ARGUED:** Gerald D. Neenan, NEAL & HARWELL, Nashville, Tennessee, for Appellant. Todd E. Panther, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Gerald D. Neenan, NEAL & HARWELL, Nashville, Tennessee, for Appellant. Todd E. Panther, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. Grubb & Ellis/Centennial, Inc. (Grubb & Ellis) agreed to be Gaedeke Holdings's exclusive broker in trying to lease the Highland Ridge Tower Office Building (the Tower), a piece of commercial property located in Nashville, Tennessee. The agreement provided that Grubb & Ellis would receive a commission on all leases signed *during* the term of the agreement, and it provided that Grubb & Ellis would earn a commission on leases signed *after* the termination of the agreement so long as within ninety days of termination "negotiations continue or resume leading to the execution of a lease with any person or entity" with whom Grubb & Ellis negotiated. JA 17.

---

[*] The Honorable R. Allan Edgar, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

Barry Smith, a broker for Grubb & Ellis, served as Gaedeke's primary brokerage agent and in the fall of 2001 was in negotiations with Bridgestone/Firestone, a potential tenant of the Tower. When Smith left Grubb & Ellis in December 2001, Gaedeke terminated its agreement with Grubb & Ellis. Nine months later, Gaedeke signed a lease agreement with Bridgestone, prompting Grubb & Ellis to seek a commission under the terms of the brokerage contract. The district court rejected the claim, concluding that Tennessee common law required Grubb & Ellis to show that it was the "procuring cause" of the lease and that this tenet of Tennessee law trumped any contrary terms in the brokerage contract, including the continuation-of-negotiations-within-90-days-of-termination provision. In our view, Tennessee law places no such constraint on the rights of contracting parties to determine when a commission is or is not due under a brokerage agreement, and accordingly we reverse.

I.

On March 29, 2001, Gaedeke signed an exclusive-brokerage agreement with Grubb & Ellis to lease the Tower, one of several pieces of commercial property owned by Gaedeke in Nashville's Highland Ridge Office Park. Among other provisions, the agreement contained the following terms:

6.    *Agreement to Refer Offers and Inquiries.* On and after the effective date hereof, and thereafter during the term of this Agreement, [Gaedeke] agrees to refer to [Grubb & Ellis] any and all offers and inquiries by prospective tenants . . . and [Grubb & Ellis] agrees to diligently investigate and develop such offers or inquiries, to canvass, solicit and otherwise employ its best efforts and services to lease space in the Building.

7.    *Owner's Reservation to Preempt Broker.* [Gaedeke] reserves the right to preempt [Grubb & Ellis] and deal directly with a Tenant with the understanding that should [Gaedeke] exercise said right the commission otherwise payable under this Agreement will be payable.

8.    *Broker's Commission.*

8.1    In consideration of this authorization and [Grubb & Ellis's] agreement to professionally use its best efforts to lease space in the Building, [Gaedeke] agrees to pay [Grubb & Ellis] a leasing commission . . . . Any commissions payable beyond ten (10) years must be agreed to in writing by [Gaedeke].

8.4    [Gaedeke] further agrees to pay [Grubb & Ellis] a commission . . . if, within ninety calendar days (90) after the expiration of the termination of the Term the property is leased to, or negotiations continue or resume leading to the execution of a lease with any person or entity with whom [Grubb & Ellis] has negotiated (either directly or through another broker or agent) or to whom the Property has been submitted prior to expiration or termination of the Term. [Grubb & Ellis] agrees to submit a list of such persons or entities to [Gaedeke] not later than fifteen (15) calendar days following the expiration of the Term.

JA 15–18.

In October 2001, Bridgestone, which had been a tenant of other buildings in the Highland Ridge Office Park since 1994, made a proposal to Gaedeke to rent space in the Tower. In accordance with Section 6 of the agreement, Gaedeke referred the inquiry to Barry Smith. Later that

month, Bridgestone broker Joseph Cherry contacted Gaedeke about the proposal and requested that Gaedeke negotiate directly with Bridgestone due to their pre-existing relationship. Gaedeke agreed to the request and informed Smith that Gaedeke would be exercising its right under Section 7 of the agreement to negotiate directly with Bridgestone but that Gaedeke would need Smith to work "behind the scenes" to bring the deal to a conclusion. JA 155.

On November 19, 2001, Cherry sent Gaedeke a lease proposal contemplating that Bridgestone would (1) lease 140,000 square feet of space in the Tower and (2) renew and expand its existing space in other parts of the Highland Ridge Office Park. Gaedeke claims that it forwarded this information to Smith for his "input and assistance," JA 156, an assertion that Grubb & Ellis does not contradict.

On November 30, 2001, Smith told Gaedeke that he planned to leave Grubb & Ellis effective December 6, 2001. Gaedeke expressed interest in continuing to use Smith as its broker, provided that he either became associated with a national brokerage firm or was willing to work for Gaedeke directly. However, according to Gaedeke, Smith became difficult to reach and failed to return numerous phone calls and e-mails over the course of the next month or so. Throughout this period of time, Gaedeke continued to negotiate with Bridgestone directly.

On January 3, 2002, Gaedeke sent a letter to Grubb & Ellis exercising its right to terminate the agreement with 30 days' written notice. In response to the notice and in accordance with Section 8.4 of the agreement, Grubb & Ellis sent Gaedeke a letter listing all individuals and entities with whom it had negotiated in its efforts to lease the Tower property. The list included Bridgestone. The termination became effective on February 3, 2002.

At this point in the chronology, the parties part ways over what happened next. According to Gaedeke, negotiations between Gaedeke and Bridgestone regarding the two-pronged lease proposal ended on March 20, 2002. And the 90-day period during which negotiations must have resumed in order for Grubb & Ellis to obtain a commission ended on May 3, 2002. It was not until May 15, 2002, that Gaedeke resumed negotiations with Bridgestone. And the new negotiations, which proposed that Bridgestone would lease just 65,000 square feet in the Tower and sublease additional space in the Tower from Gaedeke's largest tenant, the Tennessee Valley Authority, "took on a materially different character [from] the negotiations that had occurred up until that point." Gaedeke Br. at 18. Not until September 6, 2002, did Gaedeke and Bridgestone sign a lease agreement for the Tower on these new terms.

According to Grubb & Ellis, no break in the negotiations occurred, as negotiations between Gaedeke and Bridgestone "continued unabated from November 2001 until the deal was formalized by [a] June 5, 2002 letter of intent." Grubb & Ellis Br. at 4. Proving the point, it adds, the final lease is consistent with the proposal that Barry Smith first prepared for Gaedeke in November 2001.

Relying on its chronology of the negotiations, Grubb & Ellis sought a commission arising from the Gaedeke-Bridgestone lease based on Section 8.4 of the brokerage agreement. That provision, as noted, says that Grubb & Ellis is entitled to a commission "if, within ninety calendar days (90) after the expiration of the termination of the Term the property is leased to, or negotiations continue or resume leading to the execution of a lease with any person or entity with whom [Grubb & Ellis] has negotiated." JA 17. Gaedeke declined to pay the commission, and Grubb & Ellis responded by filing a breach-of-contract action in Tennessee state court. Gaedeke removed the lawsuit to federal court on diversity grounds, and both parties filed motions for summary judgment.

In ruling for Gaedeke, the district court did not rely on any one chronology of events or on the terms of the contract. It instead determined that Tennessee common law establishes that "a real estate broker earns his or her commission by actually consummating a sale of property, or by

showing that his or her efforts were the procuring cause of the transaction." D. Ct. Op. at 9 (quotation marks omitted). Relying on several cases applying Tennessee law, *see Ratner v. William Morris Agency, Inc.*, 981 F. Supp. 538 (M.D. Tenn. 1997); *Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382 (Tenn. Ct. App. 1981); *Robinson v. Kemmons Wilson Realty Co.*, 293 S.W.2d 574 (Tenn. Ct. App. 1956); *Marx & Bensdorf Inc. v. Hall*, slip op. (Tenn. Jan. 15, 1938), the district court held that Grubb & Ellis was entitled to a commission under the contract only if it could show that it was the procuring cause of the lease between Gaedeke and Bridgestone. D. Ct. Op. at 12. It then determined that Grubb & Ellis was not the procuring cause of the lease as a matter of law and denied the request for a commission.

## II.

Our standard of review is familiar. The granting of a summary-judgment motion receives de novo review, *see Wojcik v. City of Romulus*, 257 F.3d 600, 608 (6th Cir. 2001), which requires us to determine whether "there is no genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c).

As Grubb & Ellis sees the matter, it has a contractual right to the commission under Section 8.4 of the contract. The district court erred, Grubb & Ellis contends, by failing to appreciate the difference between a contractual commission claim (which is at issue here) and a non-contractual commission claim (which was at issue in most of the Tennessee cases upon which the court relied) and by writing a procuring-cause requirement into an unambiguously worded contract. Gaedeke responds that under Tennessee law, a procuring-cause requirement overshadows all brokerage contracts and prohibits a commission from being awarded when this common-law minimum has not been established, no matter what the terms of the contract say.

In answering this question, we begin by looking at the contract. Under Tennessee law, "[a]ll contracts . . . shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written." Tenn. Code Ann. § 47-50-112. When construing contracts, courts are "to give effect to the expressed intention of the parties by construing the [contract] fairly and reasonably and by giving the [contract's] language its common and ordinary meaning." *Black v. Aetna Ins., Co.*, 909 S.W.2d 1, 3 (Tenn. Ct. App. 1995) (citations omitted); *see First Tennessee Bank Nat'l Ass'n v. C.T. Resorts Co.*, No. 03A01-9503-CH-00102, 1995 Tenn. App. LEXIS 580, at *20 (Tenn. Ct. App. Aug. 30, 1995) ("Contracts are to be judged by an *objective* standard, i.e., what a reasonable onlooker would conclude the parties intended from the words expressed in the instrument."). When the language of a contract is unambiguous, a court must "interpret it as written rather than according to the unexpressed intentions of one of the parties." *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002). Courts are "precluded from making new contracts for the parties by adding or deleting provisions," *Warren v. Metro. Gov't of Nashville*, 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997), and generally may "only enforce the contract which the parties themselves have made," *Pitt*, 90 S.W.3d at 252, even when the result "may be thought harsh and unjust," *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990).

The relevant terms of the contract between Gaedeke and Grubb & Ellis leave little room for interpretation regarding the right to a commission after the agreement has ended. Section 8.4 of the contract says that Gaedeke

> agrees to pay [Grubb & Ellis] a commission . . . if, within ninety calendar days (90) after the expiration of the termination of the Term the property is leased to, or negotiations continue or resume leading to the execution of a lease with any person or entity with whom [Grubb & Ellis] has negotiated (either directly or through another broker or agent) or to whom the property has been submitted prior to expiration or termination of the Term.

JA 78. By its terms, this provision gives Grubb & Ellis a right to a commission on the lease of the Tower property—so long as "within [90 days] after the expiration" of the term of the brokerage contract the "negotiations continue[d] or resume[d] leading to the execution" of the lease.

Nor does the contract anywhere require Grubb & Ellis to establish that it was the procuring cause of a signed lease in order to receive a commission. Section 8.4 contains no such requirement, and neither does any other provision of the agreement. To the contrary: other provisions of the agreement show that the parties contemplated circumstances where Grubb & Ellis could receive a commission even though it was *not* the procuring cause of the lease. Section 6 of the agreement requires Gaedeke to refer all tenant inquiries to Grubb & Ellis but in no way prevents Grubb & Ellis from obtaining a commission on all resulting leases, regardless of the brokerage company's ultimate responsibility for producing the lease. And Section 7 allows Gaedeke to preempt Grubb & Ellis and deal directly with prospective lessors, though it still gives Grubb & Ellis a right to a commission on all resulting leases no matter how little or how much it contributed, or indeed whether it contributed at all, to the sale. So far as the terms of the contract are concerned, they do not require an inquiry into whether Grubb & Ellis was the procuring cause of the Tower lease before it has a right to a commission.

Yet that does not end the matter, the district court concluded. Relying on a prior opinion from the Middle District of Tennessee, *Ratner v. William Morris Agency*, the court determined that Tennessee law prohibits brokers from obtaining commissions on real estate sales unless they are the "procuring cause" of the transaction. D. Ct. Op. at 9. It is not clear whether the district court (or more pertinently *Ratner*) conceived of this Tennessee rule as an interpretive aid that applies to ambiguous brokerage agreements or as a common law rule that the parties could not contradict through the terms of a freely bargained-for contract. For our purposes, it makes no difference. In either event, there is no such limitation on brokerage commissions—at least when the brokerage contract specifically provides for a commission and sets out the prerequisites for obtaining one.

In reaching a contrary conclusion, *Ratner* relied on two published Tennessee cases— *Pacesetter*, 635 S.W.2d 382, and *Robinson*, 293 S.W.2d 574. While each of these cases applies a procuring-cause requirement, they do so in the context of a broker claiming a commission *not* guaranteed under a brokerage contract. Take *Pacesetter*, where the broker had an agreement with a property owner to lease his property. *See* 635 S.W.2d at 385. During the term of the agreement, the broker found a prospective tenant, introduced the tenant to the owner and participated in the ensuing negotiations. The negotiations ended unsuccessfully and the broker's term of agency expired on November 15, 1978. *Id.* Several months later, the property company and the prospective tenant resumed negotiations and executed a lease on May 8, 1979. *Id.* Although his agency had expired, the broker continued to contact the parties to stay abreast of the negotiations. *Id.* The broker claimed a commission on the lease, not because of any contractual right but because he believed he was the "proximate, efficient, and procuring cause of the lease." *Id.* The court rejected the broker's argument and noted that a broker does not have a "perpetually vested interest in any transaction taking place between the customer and the principal." *Id.* at 389. Any non-contractual rights that a broker may have, the court held, "are limited to those transactions of which his efforts are found to be the efficient, procuring cause." *Id.* at 390. But in *Pacesetter*, the court concluded, negotiations were "instituted in good faith after a substantial delay following termination of first negotiations," so the broker had no right to a commission. *Id.*

*Robinson* is to the same effect. There, too, the broker claimed a commission on a sale of property after the agency agreement had terminated, arguing that he had introduced the buyer and seller and that this introduction made him the procuring cause of the lease. *See* 293 S.W.2d at 576–77. In rejecting the broker's argument, the court observed that in the Tennessee cases in which commissions have been awarded to brokers, "such recovery was based either on the express terms of the contract with the broker, or resulted from some element of bad faith, sharp practice, fraud, or

attempt to overreach the broker." *Id.* at 577. Finding no contractual provision entitling the broker to a commission and no bad faith on the part of the seller, the court overturned a trial court judgment in favor of the broker. *Id.* at 585.

As these cases illustrate, Tennessee's procuring-cause requirement is not a sword that property owners may use to *deprive* brokers of contractually guaranteed commissions but a shield designed to *protect* brokers from being stripped of their commissions by sharp-elbowed property owners who fraudulently or in bad faith delay the consummation of a real estate transaction until after a brokerage agreement has ended. *See Pacesetter*, 635 S.W.2d at 388 ("[W]hen a broker has commenced negotiation, the owner may not defeat the claim of the broker by removing the broker and completing negotiations[] himself."); *Peavy v. Walker*, 284 S.W.2d 1, 4 (Tenn. Ct. App. 1954) (holding that a broker who diligently participated in negotiations was entitled to a commission where the owner delayed consummating a lease four or five days after the expiration of the brokerage agreement); *Newman v. Hill*, 196 S.W.2d 1008, 1009 (Tenn. Ct. App. 1945) (in rejecting the broker's non-contractual claim for a commission, the court held that "[t]his is not a case of the owner stepping in and secretly closing the deal with the agent's customer for the purpose of escaping liability for the commission").

Several Tennessee cases, moreover, have upheld contractually based commission claims without giving any indication that the broker had to be the procuring cause of the sale. *See Hagan v. Nashville Trust Co.*, 136 S.W. 993 (Tenn. 1911) (upon breach of contract by owners, broker was entitled to a commission on all sales during the five-year period of the agency contract regardless of his efforts in making the sales); *Allied Business Broker, Inc. v. Musa*, No. W1999-00378-COA-R3-CV, 2000 Tenn. App. LEXIS 793, at *9 (Tenn. Ct. App. Nov. 22, 2000) ("In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust."); *Coldwell Banker Realty House v. Morrell*, No. 96, 1988 Tenn. App. LEXIS 349, at *6–7 (Tenn. Ct. App. June 3, 1988) ("Although Morrell argues that Coldwell did nothing to earn this fee, their listing contract encompassed the possibility of a sale by Morrell when it provided for the . . . commission to be paid to Coldwell if the property was sold within the ninety-day period either by Coldwell or Morrell."); *Mande Realty v. Deerhead Resort, Inc.*, No. 87-9-II, 1988 Tenn. App. LEXIS 51, at *4 (Tenn. Ct. App. Jan. 29, 1988) ("A broker's right to be paid a commission is a contractual matter.").

That leaves an unpublished manuscript opinion of the Tennessee Supreme Court in *Marx & Bensdorf, Inc. v. Hall* (Jan. 15, 1938), which is less easy to categorize but does not support a contrary rule and does not support the district court's conclusion. We do not have a copy of *Marx & Bensdorf*, which apparently truly is an unpublished "unpublished" opinion. The decision was unearthed by the court in *Robinson* (or by the attorneys in the case) and is reprinted in full in the *Robinson* opinion. Unpublished opinions of the Tennessee Supreme Court, to say nothing of an archaeological find like *Marx & Bensdorf*, do not have the traditional force of precedent, *see* Tenn. Sup. Ct. R. 4(H)(1) & (2) (treating unpublished opinions as "persuasive authority" rather than "controlling authority"), and on that basis alone the decision could be disregarded in deciding the case at hand.

But even if *Marx & Bensdorf* were binding on us, its holding does not contradict our disposition of this case. At issue in the dispute were two land transactions—the first involving the sale of a one-half stake in a farm in exchange for a residence and the second involving the sale of the other one-half stake in the farm for another residence. The first set of sales occurred during the 90-day period of the brokerage agreement, the real estate agent received a commission on the sale under the contract, and no one questioned the payment of that commission. The second set of sales occurred two and one-half months after the contract had ended, and the real estate agent sought a commission for the sale of the one-half interest in the farm and a commission for the sale of the residence under the following provision of the brokerage agreement: "If the said property [which

is to say, the farm] be sold or disposed of during the period above stated, no matter by whom or in what manner (*or after the above period on information obtained through this agency*), I agree to pay Marx & Bensdorf, Inc., a commission." *Robinson*, 293 S.W.2d at 582 (emphasis added).

As to the sale of the residence, the court noted that the agent did not have an existing or prior contractual agreement with the owner of the residence and unsurprisingly rejected the claim for a commission as a matter of law. *Id.* at 582–83. As to the sale of the one-half interest in the farm, the agent did have a brokerage agreement with the owner of this interest in the farm and the question was whether the provision for a commission on sales after the end of the agreement covered this particular transaction. In deciding that the matter should go to a jury, the court said two things of pertinence here. First, it invoked and applied the rule discussed in *Robinson* and *Pacesetter* that a property owner may not in bad faith delay the sale of a piece of property in order to dodge a contractual requirement to pay a commission on the sale. Second, it appeared to construe the language of the contract giving the broker a right to a commission for sales "after the [90-day term of the agreement] on information obtained through this agency." In the court's words:

> The provision in complainant's contract with Hall, relied on to support the claim for a commission for the sale of the half interest in the plantation to Simpson November 24, 1934, was designed to assure compensation for service rendered by the broker under the contract before its termination, a service which operated as the inducing or procuring cause of the sale. Such a provision in a contract employing a broker cannot be construed as definitely fixing liability for the commission without reference to whether or not service was rendered and the service was the producing cause of the sale. Other matters to be considered in determining the right of the agent to a commission for service rendered after termination of the sale are: [listing good faith considerations, such as the timing of the sale and the end of agreement, whether the owner acted in good faith in not completing the sale before the end of the agreement, the effect of the broker's introduction of a subsequent buyer on the ultimate sale and the intervening causes of the sale].

*Id.* at 583.

This portion of the *Marx & Bensdorf* opinion has an inscrutable quality to it and helps explain what led to the litigation in this case and to the district court decisions in *Ratner* and below. Is the court merely interpreting the "on information obtained through this agency" clause of the contract, as suggested by the court's statement that the clause "was designed" to have a procuring-cause requirement? Is the court ruling that, no matter what the contract says, no commission is due unless the broker shows that it was the procuring cause of the sale, as suggested by the court's statement that the contract "cannot be construed as definitely fixing liability for the commission without reference to whether or not service was the producing cause of the sale"? Or is the court merely applying the bad faith rule for determining whether a post-agreement sale still entitles the agent to a commission, as suggested by the court's description of the rule and the six factors used to apply it?

While the three quoted sentences lend some support to all three interpretations, the better reading of the passage is that the court was construing the "on information obtained through this agency" provision of the contract against the backdrop of the bad-faith rule for determining whether a post-agreement sale entitles an agent to a commission. The court's analysis speaks of what the clause was "designed" to do and how it should be "construed." And while the court says that the clause "cannot" be interpreted without a procuring-cause requirement, the point is unnecessary to the analysis (as the contract did contain a causation requirement) and perhaps is best explained by the open-ended nature of the contract, which provided for a commission on sales of the farm property no matter how long after the agreement had ended so long as the sale was based on

information provided by the agency. Most pertinently, however, the court never states, let alone holds, that Tennessee common law or public policy bars individuals from negotiating brokerage contracts that permit the payment of a commission on sales after the term of the agreement and that do not contain a procuring-cause requirement.

We are given some comfort in reaching this conclusion by the fact that Gaedeke has not pointed us to any case from any state jurisdiction prohibiting such a brokerage contract. At the same time, we are aware of numerous cases from other jurisdictions that are quite consistent with our interpretation of Tennessee law. *See Kahler, Inc. v. Weiss*, 539 N.W.2d 86, 90 (S.D. 1995) (the procuring cause doctrine did not apply where by the "explicit terms of [the] contract" the broker was entitled to a commission if "within 360 days after the expiration of [the contract] period a sale is made to any person to whom the property has been shown by [broker], [owner], or any other cooperating broker"); *Nelson & Co. v. Taylor Heights Dev. Corp.*, 150 S.E.2d 142, 145 (Va. 1966) ("[B]y a special contract, a broker may be entitled to a commission" without being the procuring cause of the transaction.); *Galbraith v. Johnston*, 373 P.2d 587, 589 (Ariz. 1962) ("Provisions in exclusive listings whereby the owner . . . agrees to pay a commission to the broker if the property is sold to one [with] whom the broker has had negotiations prior to the expiration of the listing have been enforced irrespective of the fact that the broker is not the effective, efficient and procuring cause of the sale."); *Leonard v. Fallas*, 335 P.2d 665, 668 (Cal. 1959) (en banc) (Where a broker "is to be paid if the property is sold within a specified period to a person whose name is furnished to the owner by the broker, and the property is sold by the owner to such a party during the prescribed period, it is immaterial that the agent was not the procuring cause of the sale."); *Stevenson Co. v. Oppenheimer*, 104 A. 88 (N.J. 1918) (The procuring-cause doctrine was not "intended to unmake an agreement which [the parties] deliberately executed, and which fixes the terms and conditions upon which compensation shall be made."); *D.R. Horton, Inc.–Torrey v. Tausch*, ___ S.E.2d ___, No. A04A2056, 2005 Ga. App. LEXIS 94, at *5 (Ga. Ct. App. Feb. 4, 2005) ("[W]here an express contract controls the conditions under which real estate commissions are to be paid, the so-called 'procuring cause' doctrine . . . does not apply.") *Aerotronics, Inc. v. Pneumo Abex Corp.*, 62 F.3d 1053, 1064 (8th Cir. 1995) ("In both Michigan and Ohio, the procuring cause doctrine is limited by the terms of a contract; it cannot be used to supplant or contradict the terms of a contract entered into between parties.").

All of this, we recognize, does not end the parties' dispute, only the district court's basis for granting summary judgment to Gaedeke. The parties may of course renew their summary judgment motions and the other arguments made in them, all of which we leave to the district court to resolve in the first instance.

III.

For these reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.