**NOT FOR FULL-TEXT PUBLICATION**
**File Name: 06a0474n.06**
**Filed: July 6, 2006**

**No. 05-5962**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**EULA SPURLING, et al.,**

     **Plaintiff-Appellant,**

                                       **ON APPEAL FROM THE**
**v.**                                    **UNITED STATES DISTRICT**
                                         **COURT FOR THE EASTERN**
**THE FORESTLAND GROUP, LLC, et al.,**   **DISTRICT OF TENNESSEE**

     **Defendant-Appellee.**

_____/

**BEFORE:**    **SUHRHEINRICH, GILMAN and ROGERS, Circuit Judges.**

     **SUHRHEINRICH, Circuit Judge.**  Plaintiffs Eula Spurling, Tina Ogle (also known as Tina Maples), Laverne Matheson, and Sedlack Properties, Inc. ("Plaintiffs") appeal from the order of the district court granting summary judgment to Defendants The Forestland Group, LLC ("Forestland") and Heartwood Forestland Fund, L.P., and denying Plaintiffs' motion for partial summary judgment in this diversity action involving a dispute over commission fees in a commercial real estate deal. For the following reasons, we **AFFIRM**.

**I. Background**

     In August 1991, Eula Spurling, a licensed real estate agent, contacted Edgar Faust, to see if he was interested in selling an approximately 36,000 acre tract of land in Morgan County, Tennessee (the "Property"). At that time, title to the Property was vested in Emory River Land Company ("ERLC"), Faust, and several members of his family. (*Id.*) On August 26, 1991, Spurling met with Faust. According to Spurling, Faust gave her a topographic map of the Property showing the

boundaries, a booklet regarding ERLC, and a timber cruise. Faust also gave her permission to show the Property to prospective buyers. (*Id.*) Faust indicated that he would not pay a commission on the sale of the Property, and told Spurling to seek a commission from the buyer. Over the next four years, Spurling showed the Property to a number of prospective buyers and allegedly secured several offers on the Property. Only one of those offers was accepted. (*Id.*) That transaction failed to close for reasons unrelated to this litigation. (*See id.*)

On or about May 22, 1995, through the efforts of Laverne Matheson ("Matheson"), Spurling made contact with Forestland through a principal in Forestland, Tom Massengale ("Massengale"). Spurling met with Massengale in western North Carolina during the last week of May 1995. At that meeting she delivered a copy of the timber cruise of the Property to Massengale and explained Faust's parameters regarding a potential sale of the Property. Spurling alleges that she asked Massengale for a four percent commission on the gross purchase price, as it was her understanding from Matheson that Matheson and Massengale had already discussed a four percent fee to be paid by Massengale or his company in the event of a sale of the Property. Spurling also alleges that "Massengale agreed . . . that Forestland would pay a fee in the amount of 4% and told me he would have George Dutrow send a letter to that effect" to Matheson.

On June 9, 2005, George Dutrow sent the following letter:

> On behalf of The Forestland Group, I would like to express our possible interest in the 36,000 ± acre forestland tract in Morgan County, Tennessee, owned by Mr. Edgar Faust and his brother and sister. Further interest on our part would be dependent on an initial, cursory investigation of the tract to assess the probability that the property would satisfy our financial and forestland criteria.
>
> The Forestland Group recognizes certain advantages of pursuing our interests in the tract through you and your associated realtors. We would anticipate paying a reasonable commission provided that the land transaction between The Forestland Group and the Faust family is satisfactorily concluded.

Following our initial investigation to determine if there is substantive interest in pursuing purchase of the property, we would look forward to sitting down with you and determining an appropriate fee arrangement. We have written to Mr. Faust identifying possible interest in the tract by The Forestland Group, and we have requested an opportunity to visit with him to further discuss the matter.

Depending on the response of Mr. Faust and our preliminary assessment of the property, I look forward to meeting with you.

Spurling claimed that in reliance on the alleged oral agreement, she mailed five maps to Massengale at Forestland in Chapel Hill, North Carolina, on which she traced the approximate boundary lines of ERLC. She also included a copy of the entire booklet about the Property. Spurling told Massengale to write a letter introducing his company to Faust and ERLC. On June 13, 1995, Dutrow wrote the letter of introduction on behalf of Forestland to Faust. Shortly after the June 13, 1995 letter, Faust told Spurling not to take anyone else on the Property.

On June 16, 1995, Matheson sent the following letter to Massengale, seeking further assurance from Forestland regarding a commission fee. The relevant text of that letter stated:

> I received a letter dated June 9, 1995 from George Dutrow, Vice President of the Forestland Group discussing interest in the Faust Timerlands (36,000+ acres) in Morgan County, Tennessee. I understood that you and Eula had already discussed the commission fees prior to this letter. Robert Sedlack, owner of Sedlack Properties Inc., and I have difficulty interpreting George's definition of a "reasonable commission fee." Would you please clarify in writing.

On or about July 1, 1995, while Spurling's husband was showing the property, Faust asked him to leave and stated that the Property was not on the market. On July 6, 1995, Dutrow told Spurling that Faust had indicated that the Property was no longer for sale.

In 1998, Spurling learned that Forestland (now Heartwood) bought the Property on November 12, 1997, and that the sale had been orchestrated by Dillon Read & Company, an

investment firm, which had been made the exclusive agent of Faust for the sale of the Property. When Spurling attempted to collect a commission, Forestland refused to pay.

On November 9, 2001, Plaintiffs brought suit in state court. Forestland removed it to federal court on diversity grounds. The parties filed motions for summary judgment. On May 24, 2005, the district court granted summary judgment to Defendants. The district court assumed the existence of a contract, stating that it "would be inclined to find that Forestland agreed to provide plaintiffs an appropriate commission **IF** the property transaction with Faust was successfully completed." The court concluded, however, that there was no genuine issue of material fact regarding the commission because Plaintiffs were not the "procuring cause" of the land transaction. Plaintiffs appeal.

## II. Analysis

On appeal, Plaintiffs contend that the district court erred by ignoring Spurling's contract rights under the commission agreement and abused its discretion by requiring that Spurling meet the requirements for a non-contractual common law claim in order to recover a commission fee.

### A. Standard of Review

This Court reviews the district court's grant of summary judgment de novo. *Grubb & Ellis/Centennial, Inc. v. Gaedeke Holdings, Ltd.*, 401 F.3d 770, 773 (6th Cir. 2005). This requires us to determine whether "'there is no genuine issue as to any material fact'" and whether "'the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

### B. Contractual Commission

Plaintiffs claim that there were two contractual commission agreements with Forestland–one oral and one written. The district court assumed the existence of a contract. For the reasons discussed below, we conclude that neither constituted a contract.

## 1. Oral Contract

Plaintiffs argue that the oral commission agreement, standing alone, is sufficient to impose liability on Forestland for the payment of a commission. Tennessee recognizes oral contracts to pay commissions as valid, binding, and enforceable in Tennessee. *Parks v. Morris*, 914 S.W.2d 545, 547 (Tenn. Ct. App. 1995).[1] "While oral contracts are enforceable, persons seeking to enforce them must demonstrate (1) that the parties mutually assented to the terms of the contract and (2) that these terms are sufficiently definite to be enforceable." *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). The oral contract "must establish its essential terms by clear, cogent, and convincing evidence." *Parks*, 914 S.W.2d at 547. "The mutual assent need not be manifested in writing. It may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions." *Burton*, 129 S.W.3d at 521. At the same time, however,

> "in Tennessee a broker's contract for sale of real estate may be oral but, by analogy, the same quantum of proof necessary to establish a trust in real estate by parole evidence is necessary to prove an oral contract between a principal and a broker for the sale of real estate and that the contract must be proven by clear, cogent and convincing evidence though the evidence need not be uncontradicted."

*Parks*, 914 S.W.2d at 547-48 (quoting *Alexander v. C.C. Powell Realty Co.*, 535 S.W.2d 154, 157-58 (Tenn. Ct. App. 1975)).

Plaintiffs claim the mutual assent was manifested by the actions taken by both parties subsequent to the agreement between Spurling and Forestland, as reflected by (1) Spurling's actions in providing tract-specific materials to Forestland only after reaching an agreement with Forestland; (2) Forestland's actions in drafting the letter of introduction of Forestland to Faust at Spurling's

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. § 1332, diversity of citizenship. The parties agree that Tennessee law applies.

instruction; and (3) Forestland's conduct in negotiating with Faust and closing on the transaction. We conclude that none of these actions manifests a mutual assent between the parties to a commission agreement.

First, Spurling's market activity began long before the identification of Forestland as a potential buyer. Although not his agent, Spurling obtained from Faust topographical maps and certain other documents, including the booklet regarding ERLC, as well as a timber cruise. Furthermore, the record reflects that Spurling created a set of maps that were provided to approximately fifty people (real estate agents and prospective buyers) *before* even learning about Forestland. These "advertising" documents appear to be the same ones provided to Massengale, thereby calling into serious question any claim that such were created specifically at the behest of Massengale as part of any agency between Spurling and Massengale or Forestland. In its motion for summary judgment, Defendants asserted, without contradiction, that they knew of the property prior to any introduction by Spurling. Specifically, Massengale testified in his affidavit that he first learned of the Property and Faust's interest in selling it in 1993 from Tommy Thompson, and that after Spurling contacted him in 1995, he called Thompson to confirm that it was the same tract. Thus, Plaintiffs have not established any quid pro quo for a reasonable commission fee. The second factor, like the first, may be consistent with, but does not per se, establish a contractual agreement. This is equally true as to the third factor. The mere fact that Forestland actually purchased the Property two years later does not necessarily establish that Spurling and Forestland ever had a contract, written or oral. The undisputed facts show that Forestland negotiated the deal through another broker, Dillon Read, after Forestland was contacted by Dillon Read nearly two years after Spurling was informed that the property was no longer for sale. Nor do Plaintiffs allege or offer

-6-

proof that Faust and Forestland carried on continuous negotiations during this period of time. In short, these facts do not provide "clear, cogent, and convincing evidence" of mutual assent to an oral commission agreement. *Parks*, 914 S.W.2d at 547-48.

Spurling's reliance on *Parks* is misplaced. There, the Tennessee Court of Appeals held that the plaintiff-broker's testimony, along with his actions in marketing the property, as well as the corroborating testimony of another real estate broker who attended a meeting and witnessed the oral agreement, was sufficient to prove the existence of an oral contract. *Id.* at 548. Furthermore, the defendant-buyer admitted that he had made an agreement with the broker, and admitted that he would owe a commission if an acceptable offer had closed within ninety days. *Id.* In this case there is no eyewitness testimony and Forestland does not admit to any contract.

Plaintiffs also argue that the June 9 Dutrow letter provides "even clearer" evidence of the existence of a commission agreement between Forestland and Spurling. As will be discussed in detail below, the Dutrow Letter makes clear that Dutrow was careful not to create any agency until after Forestland had conducted "an initial, cursory investigation … to assess the probability that the property would satisfy [its] financial and forestland criteria" and after "sitting down with [Matheson] and determining an appropriate fee arrangement." (Dutrow Letter, J.A. p. 41). In sum, these facts do not provide clear evidence that the parties mutually assented to the terms of the oral contract and that the terms were sufficiently definite to be enforceable. Plaintiffs have failed to allege sufficient facts to survive a motion for summary judgment.

## 2. Written Commission Agreement

Alternatively, Plaintiffs maintain that even if the alleged oral agreement between Spurling and Forestland is discounted, the June 9 Dutrow Letter constitutes an offer to pay a commission,

which Spurling accepted. We hold that the Dutrow letter did not create a contract, and that the district court therefore erred in assuming that a written contract existed. In Tennessee,

> it is well established . . . that a contract can be expressed, implied, written, or oral, but an enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced. The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer."

*Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 565 (Tenn. Ct. App. 1990) (internal citations omitted).

At least three clear provisions of the Dutrow Letter indicate its tentative, rather than conclusive, nature. First, "[f]urther interest . . . would be dependent on an initial, cursory investigation . . . to assess the probability that the property would satisfy [the] financial and forestland criteria." Second, while Forestland "recognize[d] certain advantages of pursuing [its] interest through [Matheson]" it also indicated that would conduct "an initial investigation to determine if there [was] substantive interest in pursuing purchasing of the property" *after which* it "would look forward to sitting down with [Matheson] and determining an appropriate fee arrangement." In addition, the language makes clear the "anticipat[ion] [of] paying a reasonable commission provided that the land transaction between The Forestland Group and the Faust family is satisfactorily concluded." While this language states Forestland's general willingness to continue preliminary communications with Plaintiffs, perhaps leading to a commission agreement, it is precatory and did not confer acceptance. It is clear from the Dutrow Letter as a whole that while there may have been a "general willingness" to continue to communicate about a possible agency relationship, there was no current intent to recognize Matheson and/or Plaintiffs as Forestland's

agent without further negotiations. In short, the June 9 letter does not establish Forestland's commitment to pay a commission.

Further, the June 16 letter requesting that Massengale "clarify in writing" the definition of a "reasonable commission fee" completely undermines Spurling's assertion that any agreement–oral or written–involving the material terms of an agency agreement had been reached. *See Jamestowne*, 807 S.W.2d at 564 (quoting RESTATEMENT (Second) Contracts § 33)) ("The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.") Accordingly, although for different reasons, the district court did not err in granting summary judgment for Defendants. Because the Dutrow letter was not a valid, binding written contract, but merely Forestland's general willingness to continue preliminary negotiations with Plaintiffs, it did not amount to a binding contract. By the same token, it did not provide parole evidence of a valid, binding, oral agreement.

### C. Common Law

Next, Plaintiffs argue the district court erroneously assumed that commission claims in Tennessee are governed by the common-law rules for non-contractual commission claims regardless of the broker's contractual rights under a commission agreement.[2] Plaintiffs therefore claim that as

---

[2]Plaintiffs do not contend on appeal that they have a non-contractual commission claim. *Cf. Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382, 389 (Tenn Ct. App. 1981) (applying procuring cause requirement in context of a broker claiming a commission not guaranteed under a brokerage contract; rejecting broker's claim to a commission as the procuring cause of the lease, and noting that a broker does not have a "perpetually vested interest in any transaction taking place between the customer and the principal").

a result of this error, the district court adopted the erroneous position that a broker cannot recover a commission unless the broker is the procuring cause of the transaction.

Plaintiffs are right on the law. As we recently ruled in *Grubb & Ellis*, Tennessee law does not impose an overriding "procuring cause" requirement as a condition for a broker to receive a commission, such that a broker who was otherwise contractually entitled to receive a commission can recover even if he cannot prove that he is the procuring cause. *Id.* The district court's error does not matter here, however, because Plaintiffs never had a contract.

Notwithstanding, if the doctrine were to apply, we would agree that Plaintiffs were not the "procuring cause" for the reasons articulated by the district court. As the court noted, after Spurling introduced Forestland to Faust, Faust told her not to show the property to anyone else, and that on July 1, 1995, Faust told Spurling's husband that the property was not on the market. Further, negotiations ceased before plaintiff ever arranged for anyone from Forestland to speak with Faust, visit the property, complete an investigation, or make an offer to purchase. Communications between plaintiffs and Forestland stopped more than two years before Forestland purchased the property through the auction process conducted by Dillon Read. Finally, there was no proof that Defendants communicated with Forestland regarding the property until 1997, when Forestland and other potential purchasers received a solicitation from Dillon Read, and that it worked through Dillon Read to make the successful bid and purchase transaction in November 1997. (*Id.* 251.) In short, had the claim been considered on the merits, it would nonetheless fail.

### D. Failing to Strike "False and Misleading Material"

Plaintiffs also argue that the district court committed reversible error by allegedly relying on a statement in Defendants' reply brief to the effect that "[c]ommunications between plaintiffs and

Forestland stopped more than two years before Forestland purchased the property through the auction process." We reject this argument. Plaintiffs failed to offer evidence sufficient to create a genuine issue of material fact demonstrating that they were instrumental in the sale of the property to Forestland by Dillon Read. Plaintiffs have not shown that the district court abused its discretion.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

**ROGERS, Circuit Judge, dissenting.**  Though weak, the evidence, in my view, was sufficient for a jury to find a contract, as indeed the district court was inclined to find.  As the majority recognizes, the "procuring cause" requirement relied upon by the district court was not applicable.  I would therefore hold that summary judgment was not proper.