NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0141n.06
Filed: February 20, 2007

No. 06-5107

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **GRUBB & ELLIS/CENTENNIAL, INC.,** | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| **v.** | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **GAEDEKE HOLDINGS, LTD. and GAEDEKE** | ) | **O P I N I O N** |
| **LANDERS, LLC,** | ) | |
| | ) | |
| *Defendants-Appellants*. | | |

BEFORE:    KENNEDY, COLE and COOK, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.**  Defendants-Appellants Gaedeke Holdings, Ltd. and

Gaedeke Landers, LLC (collectively "Gaedeke") appeal the judgment of the district court granting

Plaintiff-Appellee Grubb & Ellis/Centennial, Inc. ("Grubb & Ellis") summary judgment on Grubb

& Ellis's claim that Gaedeke owed Grubb & Ellis a commission stemming from Gaedeke's

execution of a lease agreement with non-party Bridgestone/Firestone, Inc. ("Bridgestone"). Gaedeke

further appeals the district court's award of pre-judgment interest and attorneys' fees to Grubb &

Ellis.  For the reasons that follow, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.    Facts**

Gaedeke Landers, LLC, now known as Gaedeke Group, LLC, is the property manager for the

Highland Ridge Office Park, which is located near the Nashville, Tennessee airport. The Highland Ridge Office Park consists of five premium buildings. The individual buildings are numbered I through IV (e.g., "Highland Ridge I"), except for the fifth and largest building, called "The Tower." Gaedeke Holdings, Ltd. owns Highland Ridge III, Highland Ridge IV, and The Tower.

In March 2001, Gaedeke engaged Grubb & Ellis to provide leasing-brokerage services for Gaedeke's Highland Ridge buildings. Gaedeke executed separate agreements with Grubb & Ellis for each of Gaedeke's Highland Ridge buildings; Gaedeke drafted each agreement. The Agreement at issue here covered The Tower. Paragraph 9.1 specified that as a broker, Grubb & Ellis would have the following duties:

> Broker agrees to take all actions reasonable [sic] necessary to lease the property with due diligence. These actions shall include, but shall not be limited to, (a) staffing an on-site leasing office (to be provided by Owner, at no cost to Broker) with a licensed agent acceptable to Owner, in Owner's discretion, (b) preparing (or causing to be prepared) promotional materials regarding the Building, (c) cooperating with outside brokers who represent Tenants, (d) presenting to Owner all lease proposals submitted by or to Tenants and Cooperating Brokers, and (e) aiding Owner and its representatives in preparations of plans and specifications and negotiating and executing leases, and other documents necessary for the leasing of the Building. In addition, within twenty-one (21) days following the execution of this Agreement, Broker shall prepare and submit to Owner, for Owner's review and approval, a detailed marketing plan for the Building.

Under paragraph 8.4 of the Agreement, Gaedeke agreed to pay Grubb & Ellis commissions as follows:

> Owner further agrees to pay Broker a commission in accordance to the schedule, if, within ninety calendar days (90) after the expiration of the termination of the Term the property is leased to, or

negotiations continue or resume leading to the execution of a lease with any person or entity with whom Broker has negotiated (either directly or through another broker or agent) or to whom the Property has been submitted prior to the expiration of the Term.

Paragraph 6 of the Agreement further called for Gaedeke to refer "any and all offers and inquiries by prospective tenants" to Grubb & Ellis. Under paragraph 7, however, Gaedeke reserved the right to preempt Grubb & Ellis and negotiate directly with tenants. If Gaedeke exercised its right to deal directly with prospective tenants, Grubb & Ellis was still entitled to the commission it would have earned had Gaedeke not preempted Grubb & Ellis. In substance, these provisions state:

> Agreement to Refer to Offers and Inquiries. On and after the effective date hereof, and thereafter during the term of this Agreement, Owner agrees to refer to Broker any and all offers and inquiries by prospective tenants (each of which being hereinafter sometimes referred to as a "Tenant") and/or by cooperating, third party brokers (each of which being hereinafter sometimes referred to as a "Cooperating Broker") for space in the Building, and Broker agrees to diligently investigate and develop such offers or inquiries, to canvass, solicit and otherwise employ its best efforts and services to lease space in the Building.

> Owner's Reservation to Preempt Broker. The Owner reserves the right to preempt the Broker and deal directly with a Tenant with the understanding that should Owner exercise said right the commission otherwise payable under this Agreement will be payable.

In October 2001, Bridgestone contacted Gaedeke and proposed that Gaedeke buy Bridgestone's buildings and in exchange, Bridgestone would lease offices from Gaedeke in The Tower. Per paragraph 6 of the Agreement, Gaedeke referred Bridgestone's inquiry to Barry Smith, its broker at Grubb & Ellis. Later the same month, Bridgestone's broker, Joseph Cherry, asked Gaedeke to negotiate directly with Bridgestone, rather than through Grubb & Ellis. Gaedeke agreed

and informed Grubb & Ellis that it would handle the negotiations with Bridgestone but that it would still need Smith to work "behind the scenes" to support Gaedeke's efforts.

Early on, Gaedeke rejected Bridgestone's proposal of buying Bridgestone's buildings. Bridgestone then asked Gaedeke to prepare a proposal for Bridgestone's review, in which Bridgestone would lease approximately 140,000 square feet in The Tower, and renew and expand its existing space in Highland Ridge I. Gaedeke sent this proposal to Smith and asked for his analysis. Smith and Gaedeke agreed that Smith would prepare that portion of the proposal involving the extension and expansion of the lease at Highland Ridge I and Gaedeke would prepare that portion dealing with The Tower.

On November 30, 2001, Smith informed Gaedeke that he was leaving his position with Grubb & Ellis effective December 6, 2001. Although Smith assured Gaedeke that he would continue to be available to support Gaedeke's negotiations with Bridgestone, Smith failed to keep this promise after his departure from Grubb & Ellis.

On January 3, 2002, Gaedeke sent Grubb & Ellis a letter in which Gaedeke notified Grubb & Ellis of its intent to terminate the Agreement "pursuant to paragraph 3." The letter served as the 30-days advance notice required by the Agreement, so the termination became effective on February 2, 2002. In the letter, Gaedeke explained that although it had "enjoyed [its] collaboration with Grubb & Ellis," it felt that its relationship had been with Smith, and in light of Smith's departure, Gaedeke intended to interview a new leasing team. Gaedeke invited Grubb & Ellis to submit a list of all the leasing projects that Grubb & Ellis was currently working on and that, consistent with the Agreement, Gaedeke would give Grubb & Ellis "a 90-day window after the termination is in effect

to close those deals and be paid exclusively." Gaedeke further indicated that it would give Grubb & Ellis an opportunity to put forward a new Grubb & Ellis leasing team "within the next couple of weeks."

Grubb & Ellis responded on January 16, 2002. In its letter, Grubb & Ellis expressed regret at Gaedeke's decision and confirmed that it "would like to present our qualifications to secure the listing going forward." In a letter dated January 30, 2002, Grubb & Ellis provided Gaedeke with a list of all the prospective tenants it had worked with, such that, if Gaedeke consummated leases with any of them, Grubb & Ellis would be entitled to a commission. The list included ten prospective tenants, including Bridgestone. Grubb & Ellis closed the letter by saying that "[i]t was my hope that you would have given us the opportunity to continue our relationship."

Gaedeke responded the next day, January 31, 2002, and confirmed that it would honor its obligation to pay commissions to Grubb & Ellis if lease agreements with any of the ten prospective tenants closed within ninety days of the termination of the Agreement. Thus, Gaedeke's view was that the Agreement did not require it to pay any commissions to Grubb & Ellis for leases that were executed after May 3, 2002, the expiration of the ninety-day window.

According to Gaedeke, its lease negotiations with Bridgestone regarding the two-part proposal ceased on March 20, 2002. Apparently, the negotiations came to a halt because Bridgestone entered into negotiations with another commercial property owner that would enable Bridgestone to locate all of its offices in a single building, something the two-building negotiations with Gaedeke did not contemplate.

Beginning on May 15, 2002, however, Bridgestone resumed negotiations with Gaedeke after

Bridgestone's negotiations with the other commercial landlord cratered. At this juncture, Bridgestone informed Gaedeke that its leasing needs had changed. Bridgestone now sought to lease approximately 65,000 square feet in The Tower and sub-lease 134,000 square feet of space in The Tower from the Tennessee Valley Authority ("TVA"), which was already a Gaedeke tenant. Although Gaedeke regarded this as a less desirable arrangement because Gaedeke would lose TVA as a tenant and increase the amount of space it was leasing by only 65,000, Gaedeke prepared a proposal reflecting this request and sent it to Bridgestone for review. Thereafter, Gaedeke and Bridgestone only negotiated over the 65,000 square feet of space in The Tower, and Bridgestone negotiated with the TVA about obtaining a sub-lease of the TVA's 134,00 square feet in The Tower. A letter of intent was signed on July 3, 2002, and the final lease was executed on September 6, 2002.

After the lease was executed, Gaedeke paid a total commission of 5.5 percent of the base rent during the initial term of the lease, including 4 percent to Bridgestone's broker, Cherry, and 1.5 percent to itself. The 1.5 percent commission equals $270,254.46. Grubb & Ellis concedes that it would have been reasonable to pay Cherry a 4 percent commission, but it contends that it is entitled to the 1.5 percent commission that Gaedeke paid to itself.

**B.     Procedural History**

Grubb & Ellis filed its complaint in Tennessee state court on December 10, 2002. Gaedeke timely removed the case to federal court based on diversity jurisdiction.

The parties cross-moved for summary judgment. The district court held that under Tennessee law, Grubb & Ellis was not entitled to a commission because it was not the "procuring cause" of the lease transaction between Gaedeke and Bridgestone. The district court thus granted summary

judgment for Gaedeke. Grubb & Ellis appealed and this Court reversed and remanded on March 30, 2005. *See Grubb & Ellis/Centennial, Inc. v. Gaedeke Holdings, Ltd.*, 401 F.3d 770 (6th Cir. 2005) ("*Grubb & Ellis I*").

On remand, the parties again brought cross-motions for summary judgment. The district court granted Grubb & Ellis's motion, concluding that Grubb & Ellis was entitled to a commission under the Agreement. The parties then separately briefed the issue of how much money Grubb & Ellis was owed. Grubb & Ellis also filed a motion for attorneys' fees and expenses. On December 12, 2005, the magistrate judge issued a Report and Recommendation awarding Grubb & Ellis a commission of $270,254.46, pre-judgment interest of $49,634.21, attorneys' fees of $103,309.50, and expenses of $5,944.06. The district judge entered an order on January 6, 2006, overruling the parties' objections to the magistrate judge's Report and Recommendation, and adopting the Report and Recommendation in full. Thereafter, on January 13, 2006, Gaedeke filed a notice of appeal, arguing that the district court erred in granting summary judgment for Grubb & Ellis, and in granting and calculating the amount of attorneys' fees and pre-judgment interest owed Grubb & Ellis.

## II. DISCUSSION

### A. The Summary Judgment Order

#### 1. Standard of Review

A grant of summary judgment is reviewed de novo using the same legal standard employed by the district court. *Wojzik v. City of Romulus*, 257 F.3d 600, 608 (6th Cir. 2001). Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

movant has the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether the movant has met its burden, the Court views the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To show the existence of a genuine factual issue, the nonmoving party must demonstrate that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

2.      Tennessee Contract-Law Principles

The Agreement between the parties calls for it to be interpreted according to Tennessee principles of contract law. In interpreting contracts, Tennessee law requires courts to "ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). "If a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute." *Teter v. Republic Parking Sys.*, 181 S.W.3d 330, 342 (Tenn. 2005). "The courts do not concern themselves with the wisdom or folly of a contract . . . and are not at liberty to relieve parties from contractual obligations simply because these obligations later prove to be burdensome or unwise." *Tenn. Div. of the United Daughters of the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98, 118 (Tenn. Ct. App. 2005) (internal citations omitted). Courts "will not make a new contract for parties who have spoken for themselves." *Id.*; *see also Braden v. Strong*, No. M2004-02369-COA-R3-CV, 2006 Tenn. App. LEXIS 104, *31 (Tenn. Ct. App. Feb. 16, 2006) (stating that courts cannot rewrite contracts for the parties "but can only enforce the contract which the parties themselves have

made").

3.      Paragraph 8.4 of the Agreement Controls the Resolution of the Parties' Dispute

This case involves a straightforward contract dispute. Paragraph 8.4 of the Agreement says that Gaedeke will pay Grubb & Ellis a commission if, within ninety days of the Agreement's termination, "the property is leased to, or negotiations continue or resume leading to the execution of a lease with any person or entity with whom [Grubb & Ellis] has negotiated." These are the only requirements to fulfillment of paragraph 8.4. Moreover, the contractual language does not admit of any exceptions permitting Gaedeke to withhold the payment of a commission, provided that the foregoing requirements are satisfied. *See Grubb & Ellis I*, 401 F.3d at 774 (referring to paragraph 8.4 and commenting that "[t]he relevant terms of the contract between Gaedeke and Grubb & Ellis leave little room for interpretation regarding the right to a commission after the agreement has ended").

There is no dispute that while the contract was in force, Grubb & Ellis negotiated with Bridgestone, first directly and then in support of Gaedeke's efforts. There is no dispute that Gaedeke negotiated with Bridgestone during the ninety-day post-termination period, which expired on May 3, 2002. Finally, there is no dispute that Gaedeke successfully executed a lease with Bridgestone on September 6, 2002.

Based on these uncontroverted facts, and the plain language of the Agreement, the district court correctly concluded that Grubb & Ellis is entitled to a commission on the lease transaction between Gaedeke and Bridgestone.

4.      Gaedeke's Challenges to the District Court's Order

Gaedeke raises several assignments of error, none of which has merit. Each of Gaedeke's arguments are discussed in turn.

a) *Gaedeke is Not Relieved of its Obligation to Pay Grubb & Ellis by Virtue of Grubb & Ellis's Purported Breach of the Agreement*

As an initial matter, Gaedeke argues that Grubb & Ellis breached its duties under paragraphs 6, 8.1, and 9.1 of the Agreement and that therefore, under Tennessee law, Grubb & Ellis forfeited its right to a commission. These provisions specify the brokerage services that Grubb & Ellis was obliged to provide. Under paragraph 6.1, Grubb & Ellis agreed to market Gaedeke's rental property to prospective tenants: "Broker agrees to diligently investigate and develop such offers or inquiries, to canvass, solicit and otherwise employ its best efforts and services to lease space in the Building." Paragraph 8.1 conditions Grubb & Ellis's receipt of a commission on Grubb & Ellis's "agreement to professionally use its best efforts to lease space in the Building." Paragraph 9.1 enumerated Grubb & Ellis's specific duties, including, among other things, staffing an on-site leasing office with a licensed agent; preparing promotional materials; working with outside brokers who represented prospective tenants; presenting Gaedeke with lease proposals submitted by prospective tenants; and assisting Gaedeke in negotiating and executing leases.

According to Gaedeke, once Smith separated from Grubb & Ellis, Grubb & Ellis failed to perform any of its brokerage duties under the Agreement with respect to Bridgestone and other prospective tenants. As a result, Gaedeke was not able to draw on Smith's expertise and assistance and Gaedeke was left in a materially worse negotiating posture relative to Bridgestone than it would have been in had Smith remained at Grubb & Ellis.

- 10 -

Gaedeke argues that it cannot be held liable for the commission because Grubb & Ellis committed the first material breach of the contract. Gaedeke supports its argument by citing to section 237 of the Restatement (Second) of Contracts, which says that "[a] material failure of performance . . . prevents performance of those duties from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur."

Even if Grubb & Ellis breached the Agreement, Gaedeke is still required to pay the commission. As the district court correctly concluded, paragraph 8.4 in no way conditions receipt of the commission upon Grubb & Ellis's performance of its duties under the contract. Had Gaedeke intended to ensure that Grubb & Ellis could not recover a commission if Grubb & Ellis committed a material breach of the contract, Gaedeke could have drafted paragraph 8.4 to reflect this intention. *See Giuliano*, 995 S.W. 2d at 95. Gaedeke did not do so, either expressly or implicitly, and this Court is powerless to insert a contractual term into the Agreement, which the plain language of the Agreement forecloses. *Braden*, 2006 Tenn. App. LEXIS at *31.

Furthermore, Gaedeke's allegations of a breach are not supported by the record. Gaedeke never notified Grubb & Ellis that it believed Grubb & Ellis had breached the Agreement, nor did it give Grubb & Ellis an opportunity to correct that breach. When Gaedeke informed Grubb & Ellis that it was terminating the Agreement, it stated that it had enjoyed [its] collaboration with Grubb & Ellis," and that it would give Grubb & Ellis an opportunity to present a new leasing team in Smith's stead within a few weeks. Neither of these statements is consistent with the view that Grubb & Ellis failed to perform under the Agreement. Similarly, although Grubb & Ellis characterizes Smith as having abdicated his responsibilities to continue to support Gaedeke's negotiations with Bridgestone,

Gaedeke apparently went to great pains to persuade Smith to continue handling Gaedeke's brokerage needs by either coming to work directly for Gaedeke as a Gaedeke broker, or by affiliating with another brokerage house of national repute and taking the Gaedeke account there. In short, the record no where reflects contemporaneous charges of breach that Gaedeke now levels against Grubb & Ellis.

Finally, because Grubb & Ellis's purported breach of the Agreement does not relieve Gaedeke of paying a commission, Gaedeke's argument that Grubb & Ellis may only recover in quantum meruit, i.e., for the value of the work Grubb & Ellis actually performed, is meritless.

b) *Paragraph 7 Does Not Exempt Gaedeke from Paying Grubb & Ellis a Commission*

Gaedeke next argues that it is not required to pay a commission to Grubb & Ellis because Bridgestone insisted upon dealing directly with Gaedeke. Gaedeke acknowledges that paragraph 7 of the Agreement preserves Grubb & Ellis's right to a commission even where Gaedeke conducts negotiations directly with the prospective tenant. Nonetheless, Gaedeke claims that Grubb & Ellis is only entitled to the protection of this provision where Gaedeke intercedes in the negotiations of its own volition, not where Gaedeke is drawn into the negotiations by the insistence of the prospective tenant.

This argument borders on the frivolous. The plain language of paragraph 7 does not make the distinction that Gaedeke urges upon this Court. Moreover, Bridgestone is not a party to the Agreement. Bridgestone could not exercise the right of Gaedeke to preempt Grubb & Ellis in the negotiations; only Grubb & Ellis could do that.

c) *Gaedeke's Lease with Bridgestone Did Not Result from New Negotiations*

Gaedeke next contends that the lease with Bridgestone resulted from totally separate negotiations that did not commence until the ninety-day post-termination period had expired. As proof, Gaedeke argues that the terms of the executed lease were substantively different from those discussed while the Agreement was in effect and during the post-termination period: Whereas the initial negotiations centered on Gaedeke's purchasing Bridgestone's buildings and Bridgestone renewing and expanding its lease in Highland Ridge I, the terms of the July 3, 2002 letter of intent executed by Gaedeke and Bridgestone instead entailed Bridgestone's leasing space exclusively in The Tower and arranging a sub-lease with the TVA. Thus, according to Gaedeke, the lease that was ultimately agreed to had nothing to do with the negotiations that were underway during the pendency of the Agreement and during the post-termination period.

Once again, the plain language of the Agreement contradicts Gaedeke's argument. Paragraph 8.4 simply says that Grubb & Ellis is entitled to a commission if a lease is either executed within ninety days of the termination of the Agreement, or if negotiations "continue or resume leading to the execution of a lease" during this period. There is no dispute that the lease was executed after the ninety-day post-termination period but only a question as to whether the negotiations "continued" during this period. Even if Gaedeke is right that the negotiations stalled in mid-March 2002 and did not re-start until May, after the expiration of the ninety-day post-termination period, the negotiations that occurred during the post-termination period ultimately culminated in the execution of the lease. This is sufficient to entitle Grubb & Ellis to a commission. Moreover, paragraph 8.4 does not extinguish Grubb & Ellis's right to a commission just because the negotiations altered in character

- 13 -

or substance over time.  Indeed, it would contradict the meaning of the word "negotiations," which signifies trade-offs and compromise, if the Agreement conditioned the receipt of a commission upon the substance of the negotiations remaining static.  *See Merriam Webster's Collegiate Dictionary*, 10th ed. (1995) (defining "negotiate" as "to arrange for or bring about through conference, discussion, and compromise").

In addition to the plain language of the Agreement not supporting Gaedeke's "new" negotiations argument, the record does not substantiate it.  The record shows that Gaedeke rejected the idea of purchasing Bridgestone's buildings before the end of the ninety-day post-termination period.  In fact, proposals circulated by Bridgestone and Gaedeke on January 21, 2002, February 15, 2002, and March 12, 2002 make no mention of Gaedeke acquiring Bridgestone's buildings. Similarly, discussions about Bridgestone entering into a sublease with the TVA first occurred during, not after, the expiration of the ninety-day post-termination period.  In an email dated February 28, 2002, Bridgestone broker Cherry asked Gaedeke to be prepared to discuss how much space Bridgestone could take over from the TVA.  The TVA sublease is also referenced in emails dated April 19, 2002 and April 24, 2002.  Thus, the facts simply do not support the proposition that the terms that ultimately comprised the executed lease did not surface until after the ninety-day post-termination period had run.

      d)     *Paragraph 8.4 Does Not Contain a Time Limitation and There is no Basis Upon Which This Court Could Engraft Such a Limitation onto this Provision*

Gaedeke next argues that the district court's ruling has the perverse consequence of enabling Grubb & Ellis to obtain a commission "into perpetuity."  Gaedeke asks this Court to read a

reasonable time limitation into paragraph 8.4, such that if its lease with Bridgestone was not executed within this reasonable time, Grubb & Ellis would not be entitled to a commission. Conveniently, Gaedeke defines a "reasonable time" as ninety days.

Gaedeke's argument is unavailing. Its preferred reading of paragraph 8.4 defies that provision's plain language, which, by its terms, sets no outside boundaries beyond which Grubb & Ellis is precluded from receiving a commission. To read a ninety-day limitation into paragraph 8.4 would violate this Court's duty to refrain from re-writing the parties' contract and would eviscerate paragraph 8.4's command that Grubb & Ellis is entitled to a commission so long as the negotiations "continue[d] or resume[d]" within ninety days of the Agreement's termination.

Confronted with a losing hand under the plain language of paragraph 8.4, Gaedeke cites to this Court's interpretation in *Grubb & Ellis I* of the Tennessee Supreme Court's memorandum opinion in *Marx & Bensdorf, Inc. v. Hall* as support. *Grubb & Ellis I* considered *Marx & Bensdorf* solely to determine whether Tennessee law required Grubb & Ellis to be a "procuring cause" of Gaedeke's lease with Bridgestone in order to recover a commission. *Grubb & Ellis I* did not rule that contractual terms that allow brokers to collect commissions on deals consummated after the termination of the contract, and that do not impose any deadlines for doing so, are impermissible. Moreover, nothing in *Marx & Bensdorf* itself suggests that courts should modify contractual language to impute a reasonable time limitation into brokerage contracts that are silent with respect to how long after the expiration of the contract a broker is entitled to a commission.

For the foregoing reasons, we affirm the grant of summary judgment to Grubb & Ellis.

**B.      The Pre-Judgment Interest and Attorneys' Fees Award**

In a Report and Recommendation dated December 22, 2005, the magistrate judge awarded Grubb & Ellis a commission of $270,254.46, pre-judgment interest of $49,634.21, and attorneys' fees and expenses of $109,253.56. In an order entered on January 6, 2006, the district judge adopted the magistrate judge's recommendations.

Gaedeke does not challenge the amount of the commission awarded to Grubb & Ellis. However, Gaedeke objects to the award of both pre-judgment interest and attorneys' fees. Gaedeke further argues that to the extent these awards are authorized, they were improperly calculated below.

1.      Standard of Review

We review a district court's decision to award pre-judgment interest for an abuse of discretion. *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). The abuse-of-discretion standard also applies to our review of the trial court's grant of attorneys' fees. *Owner-Operator Indep. Drivers Ass'n v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000). "[A]n abuse of discretion exists only when the court has the definite and firm conviction that the district court made a clear error of judgment in its conclusion upon weighing relevant factors." *Moon v. Unum Provident Corp.*, 461 F.3d 639, 643 (6th Cir. 2006).

2.      Pre-Judgment Interest

As an initial matter, Tennessee law supports the award of pre-judgment interest in the circumstances here.[1] Under Tennessee Code Annotated section 47-14-109(b), pre-judgment interest

---

[1]Gaedeke argues that to the extent pre-judgment interest may be ordered, it should be calculated according to the federal statute governing *post-judgment interest*. *See* 28 U.S.C. § 1961 (2006). However, this statute is inapplicable because "[i]n a diversity case, state law governs the district court's decision whether to award prejudgment interest . . ." *Conte*, 215 F.3d

is mandatory. This provision provides that "[l]iquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due." Here, the liquidation requirement is satisfied because "the amount of the debt is certain or can be made certain by mere computation." *Performance Sys., Inc. v. First Amer. Nat'l Bank*, 554 S.W.2d 616, 618-19 (Tenn. 1977). Gaedeke does not dispute that the amount of the commission owed to Grubb & Ellis is $270,254.46. Moreover, there is no dispute that Gaedeke signed the Agreement. The requirements of Tennessee's mandatory pre-judgment interest statute are therefore satisfied.

In addition, Tennessee Code Annotated section 47-14-123 also enables Grubb & Ellis to collect pre-judgment interest. That provision says that "[p]rejudgment interest . . . may be awarded by courts or juries in accordance with the principles of equity at a rate not in excess of a maximum effective rate of ten percent (10%) per annum."

The magistrate judge concluded that equity supported the award of pre-judgment interest because "[t]he defendants paid a commission to themselves and thus had the benefit of those funds for the entire time leading up to the final decision of the District Judge in this matter." *See Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985 (6th Cir. 2000) ("We have long recognized that the district court may award prejudgment interest at its discretion in accordance with general equitable principles.") (internal citation omitted). Although Grubb & Ellis urged the magistrate judge to apply a variable interest rate between 8 and 10 percent, the magistrate judge determined that 7 percent was a fair rate because it "approximat[ed] the interest the plaintiffs would have received had they been

at 633.

paid." *Id.* at 986 (noting that courts may apply the interest rate actually earned by the defendants on the money wrongfully withheld).

Paragraph 8.2(a) of the Agreement specifies that Gaedeke would pay Grubb & Ellis half of the amount of the commission two weeks after Gaedeke received, among other things, a fully executed copy of the lease and the first month's rent. Gaedeke was obligated to pay the balance of the commission two weeks after the tenant occupied the premises.

Based on the foregoing, the magistrate judge calculated a 7 percent rate on half of the amount of the commission, i.e., $135,077.23 from October 14, 2002 (two weeks after Gaedeke received the executed lease) through March 19, 2003. The magistrate judge then calculated the 7 percent rate on the full commission amount, $270,154.46,[2] from March 19, 2003 (two weeks after Bridgestone took possession of the premises) through the date of the district court's judgment. This resulted in an accrued amount of pre-judgment interest of $49,634.21, which is less than the total award of $66,348.57, that Grubb & Ellis calculated based on a higher interest rate (eight to ten percent).

Gaedeke contends that to the extent an interest award may be made here, the district judge erred by accepting the magistrate judge's calculations. Gaedeke says that interest on the commission should not be deemed to have begun accruing until March 30, 2005, the date of this Court's decision reversing the district court's grant of summary judgment for Gaedeke. Gaedeke reasons that its position in defending the lawsuit was reasonable and that until this Court's prior disposition

---

[2]We note that the parties agree that the commission amount is $270,254.46. The magistrate judge, however, appears to have mistakenly calculated the amount of pre-judgment interest due to Grubb & Ellis based on a total commission of $270,154.46. The parties do not object to this mistake, and we therefore do not deal with it.

clarifying the state of the law with respect to the "procuring cause" issue, Gaedeke had prevailed. This argument does not warrant reversing the district court's exercise of discretion in awarding pre-judgment interest. In recommending an interest award, the magistrate judge took "into account the fact that the defendants did have a reasonable basis for their claim, and in fact, initially prevailed in this matter."

Accordingly, we affirm the district court's grant of pre-judgment interest to Grubb & Ellis.

3.    Attorneys' Fees

Paragraph 15.4 of the Agreement provides that in a dispute over the meaning of the Agreement, the prevailing party "shall be entitled to recover" its attorneys' fees. Paragraph 15.4 states:

> In the event that a dispute arises between [Gaedeke] and [Grubb & Ellis] under the terms of this Agreement and such dispute results in judicial action, the prevailing party shall be entitled to recover as a part of such action its reasonable attorneys' fees and court costs.

Grubb & Ellis moved for $124,834 in attorneys' fees and $5,944.06 in costs, for a total award of $130,778.06. Gaedeke argued, as it does on appeal, that Grubb & Ellis's expenditure of 460 billing hours litigating the case was excessive and that the billing rate for Grubb & Ellis's attorneys is too high. Gaedeke points out that its counsel spent only 255 hours to prepare the same work product and charged a lesser hourly rate.

The magistrate judge concluded that Grubb & Ellis was entitled to recover attorneys' fees and costs given the Agreement's authorization for such an award for a prevailing party. In considering what a fair and reasonable amount of attorneys' fees would be, the magistrate judge took

into account the "excellent result" procured by Grubb & Ellis's counsel, as well as the fact that "the attorney who is on the offense in a particular case will normally be required to expend more time than an attorney in a defensive posture." However, in light of the substantial discrepancy in the amount of time that each party spent on the case (a difference of approximately 205 hours), the magistrate judge reduced the number of billable hours for which Grubb & Ellis could obtain attorneys' fees from 460.35 to 375. The magistrate judge then assigned $270 as a reasonable hourly rate for Grubb & Ellis's lead counsel and further calculated the hourly rates for the other Grubb & Ellis attorneys and paralegals who worked on the case.

Thus, the magistrate judge followed this Court's instructions for awarding attorneys' fees in that he "calculate[d] the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" and he considered the result obtained by Grubb & Ellis's counsel in making these calculations. *Jordan v. City of Cleveland*, 464 F.3d 584, 602 (6th Cir. 2006). Moreover, given the magistrate judge's careful review of the time records and affidavits submitted by both parties, and the magistrate judge's greater familiarity with prevailing attorney billing rates in the Nashville market, we have no basis for concluding that the district judge abused his discretion in adopting the Report and Recommendation of the magistrate judge.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court granting summary judgment to Grubb & Ellis and awarding Grubb & Ellis attorneys' fees and pre-judgment interest.